# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

### APPEAL NOS. 22-1982, 23-1112 & 23-1133

### UNITED STATES,
Appellee,

### v.

### ANTHONY RIVERA-RIVERA;
### VICTOR M. HERNÁNDEZ-CARRASQUILLO;
### JIMMY RÍOS-ALVAREZ, a/k/a Pi,
Defendants-Appellants.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

## CONSOLIDATED BRIEF FOR APPELLEE

---

W. Stephen Muldrow
United States Attorney

Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

Ricardo A. Imbert-Fernández
Assistant United States Attorney
United States Attorney's Office
Torre Chardón, Suite 1201
350 Carlos Chardón Avenue
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

# TABLE OF CONTENTS

Table of Authorities..................................................................... vi

Jurisdictional Statement ...............................................................1

Statement of the Issues on Appeal.................................................2

Statement of the Case ...................................................................3

    A.    Rivera, Hernández, Ríos, and three others invade a home at gunpoint, ransack the home, torture its residents, and carjack their pick-up truck.................................................................................3

    B.    Rivera, Hernández, and Ríos are charged; opt for trial...................8

    C.    Rivera moves for severance and challenges a perceived Brady violation; loses both motions ...................................................8

    D.    The evidence is presented to a jury at trial....................................11

    E.    Rivera, Hernández, and Ríos raise specific arguments to challenge the sufficiency of the evidence at the close of the United States' case and at the close of all the evidence..............................................13

    F.    The jury convicts Rivera, Hernández, and Ríos on both counts.....16

    G.    The district court sentences Rivera ...............................................16

    H.    The district court sentences Hernández.........................................20

Summary of the Argument.......................................................23

Argument .............................................................................24

**I. The United States sufficiently proved that Rivera, Hernández, and Ríos aided and abetted a carjacking and carried firearms in furtherance of that carjacking.**

Issue....................................................................................24

Standard of Review .............................................................25

Discussion ...........................................................................26

    A. Conditional Intent of the Principals..............................28

    B. Acts of the Aiders.........................................................33

    C. Intent of the Aiders .....................................................40

    D. The Firearm Count.....................................................45

**II. The district court did not abuse its discretion by denying Rivera's Brady claims.**

Issue....................................................................................47

Standard of Review .............................................................47

Discussion ...........................................................................47

**III. The district court did not abuse its discretion by denying severance of Rivera's trial.**

Issue....................................................................................55

Standard of Review ...............................................................55

Discussion ...........................................................................56

**IV. Rivera waives his challenge to the admission of eight statements on Confrontation Clause grounds by failing to develop his argument. He also waives his claims as to five of those statements because he did not lodge an objection below and failed to argue plain error. The remaining statements are either unaffected by the Confrontation Clause or harmless.**

Issue ...................................................................................63

Standard of Review ...............................................................63

Discussion ...........................................................................64

   A. Rivera fails to develop his argument and relies on unavailing

      caselaw .......................................................................65

   B. Rivera waives most of his challenges by ignoring plain error

      review .........................................................................68

   C. Even if not waived, the abovesaid statements are not subject to

      the Confrontation Clause ...........................................70

   D. The other challenged statements are either not subject to the

      Confrontation Clause or are harmless .........................72

**V. The district court gave Rivera and Hernández reasonable sentences.**

Issue...................................................................................76

Standard of Review................................................................76

Discussion............................................................................77

    A. Rivera waives his criminal history category claim ......................78

    B. The serious bodily injury enhancement was amply supported

       by the record..............................................................80

    C. The abduction enhancement was properly applied too...............83

    D. Hernández's sentencing challenge is without merit....................89

Conclusion............................................................................94

Certificate of Compliance.........................................................95

Certificate of Service................................................................96

**FEDERAL CASES**

Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44 (1st Cir. 2021) ............... 50, 58

Crawford v. Washington, 541 U.S. 36 (2004) .................................... passim

Davis v. Washington, 547 U.S. 813 (2006) ................................................ 66

Dimott v. United States, 881 F.3d 232 (1st Cir. 2018) ........................... 50, 58

Dutton v. Evans, 400 U.S. 74 (1970) ........................................................ 66

Echevarría v. AstraZeneca Pharmaceutical LP,
    856 F.3d 119 (1st Cir. 2017) ............................................... 50, 58

Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469 (1992) .................... 79

Gall v. United States, 552 U.S. 28 (2007) ................................................. 89

Giles v. California, 554 U.S. 353 (2008) .................................................... 66

Hemphill v. New York, 595 U.S. 140 (2022) .............................................. 67

Holloway v. United States, 526 U.S. 1 (1999) ................................. 28, 33, 36

Kotteakos v. United States, 328 U.S. 750 (1946) ........................................ 61

Michigan v. Bryant, 562 U.S. 344 (2011) ................................. 64, 66-67, 71

Nixon v. City & Cnty. of Denver, 784 F.3d 1364 (10th Cir. 2015) .......... 50, 58

Ohio v. Clark, 576 U.S. 237 (2015) ......................................................... 66

Ohio v. Roberts, 448 U.S. 56 (1980) ........................................................ 67

Ramirez–Burgos v. United States, 313 F.3d 23 (1st Cir. 2002).....................37

Rodríguez v. Municipality of San Juan, 659 F.3d 168 (1st Cir.2011) ... passim

Rosemond v. United States, 572 U.S. 65 (2014)................................... 41, 43

Strickler v. Greene, 527 U.S. 263 (1999) ......................................................48

Thomas v. Rhode Island, 542 F.3d 944 (1st Cir. 2008) .......................... 50, 58

United States v. Abbas, -- F.4th --,
  2024 WL 1853052 (1st Cir. Apr. 29, 2024)......................................... 70, 78

United States v. Acevedo-Maldonado, 696 F.3d 150 (1st Cir. 2012)...... 63, 69

United States v. Almeida, 748 F.3d 41 (1st Cir. 2014)................................81

United States v. Avilés-Colón, 536 F.3d 1 (1st Cir. 2008)...........................49

United States v. Ayala-Lugo, 996 F.3d 51 (1st Cir. 2021)...........................77

United States v. Bailey, 270 F.3d 83 (1st Cir. 2001)...................................71

United States v. Balser, 70 F.4th 613 (1st Cir. 2023)........................... passim

United States v. Bellomo, 176 F.3d 580 (2d Cir. 1999) ..............................71

United States v. Boylan, 898 F.2d 230 (1st Cir. 1990)........................... 60-61

United States v. Brady, 373 U.S. 83 (1963) ................................................48

United States v. Bramley, 847 F.3d 1 (1st Cir. 2017)............................ 70, 78

United States v. Brito, 427 F.3d 53 (1st Cir. 2005).....................................66

United States v. Brown, 26 F.4th 48 (1st Cir. 2022)....................................92

United States v. Buck, 847 F.3d 267 (5th Cir. 2017) .................................86

United States v. Buoi, 84 F.4th 31 (1st Cir. 2023).........................................25

United States v. Cabrera-Rivera, 583 F.3d 26 (1st Cir. 2009).......................73

United States v. Carrero-Hernández, 643 F.3d 344 (1st Cir. 2011)........ 77, 81

United States v. Castro-Davis, 612 F.3d 53 (1st Cir. 2010)..........................66

United States v. Catalan-Roman, 585 F.3d 453 (1st Cir. 2009) ...................57

United States v. Catalán-Roman, 585 F.3d 453 (1st Cir. 2009) ...................29

United States v. Celestin, 612 F.3d 14 (1st Cir. 2010)..................................47

United States v. Chesser, 795 F. App'x 242 (5th Cir. 2019).........................51

United States v. Chhien, 266 F.3d 1 (1st Cir. 2001)......................................37

United States v. Clogston, 662 F.3d 588 (1st Cir. 2011)...............................92

United States v. Colón-De Jesús, 85 F.4th 15 (1st Cir. 2023) .......................70

United States v. Colon-Diaz, 521 F.3d 29 (1st Cir. 2008)....................... 70, 78

United States v. Concepcion-Guliam, 62 F.4th 26 (1st Cir. 2023)...............69

United States v. Cruz-Feliciano, 786 F.3d 78 (1st Cir. 2015) ........... 49, 51-53

United States v. Cunningham, 201 F.3d 20 (1st Cir. 2000).........................84

United States v. Darby, 744 F.2d 1508 (11th Cir. 1984)..............................71

United States v. Davila-Gonzalez, 595 F.3d 42 (1st Cir. 2010) ...................90

United States v. De Leon-Quinones, 588 F.3d 748 (1st Cir. 2009) ..............45

United States v. DeCologero, 530 F.3d 36 (1st Cir. 2008)...........................47

United States v. Diaz-Rosado, 857 F.3d 116 (1st Cir. 2017)....................28-30

United States v. Dixon, 449 F.3d 194 (1st Cir. 2006)....................................91

United States v. Douglas, 525 F.3d 225 (2d Cir. 2008) ...............................52

United States v. Drougas, 748 F.2d 8 (1st Cir. 1984)..................................57

United States v. Earle, 488 F.3d 537 (1st Cir.2007) ....................................73

United States v. Elkins, 16 F.3d 952 (8th Cir. 1994) ...................................85

United States v. Encarnación–Ruiz, 787 F.3d 581 (1st Cir. 2015) ..... 28, 41-42

United States v. Falcón-Nieves, 79 F.4th 116 (1st Cir. 2023) ............ 26-27, 35

United States v. Figueroa-Cartagena,
    612 F.3d 69 (1st Cir. 2010).....................................................37, 39, 42, 64

United States v. Flores-Rivera, 56 F.3d 319 (1st Cir. 1995).........................56

United States v. Font-Ramirez, 944 F.2d 42 (1st Cir. 1991) ................... 50, 59

United States v. Ford, 821 F.3d 63 (1st Cir. 2016)................................ 28, 41

United States v. Franklin, 51 F.4th 391 (1st Cir. 2022) ...............................67

United States v. Garay-Sierra, 832 F.3d 64 (1st Cir. 2016).........................80

United States v. Garcia-Alvarez, 541 F.3d 8 (1st Cir. 2008) ...................30-32

United States v. García-Pastrana, 584 F.3d 351 (1st Cir. 2009)...................26

United States v. Guerrero-Narvaez, 29 F.4th 1 (1st Cir. 2022) .............. 26, 29

ix

United States v. Hawkins, 87 F.3d 722 (5th Cir. 1996)...............................85

United States v. Hefferon, 314 F.3d 211 (5th Cir. 2002)............................85

United States v. Henderson, 320 F.3d 92 (1st Cir. 2003)............................45

United States v. Hernández, 218 F.3d 58 (1st Cir. 2000)............................25

United States v. Houghton, 554 F.2d 1219 (1st Cir. 1977).........................52

United States v. Hudson, 823 F.3d 11 (1st Cir. 2016)................................37

United States v. Innamorati, 996 F.2d 456 (1st Cir. 1993) ..........................56

United States v. Iwuala, 789 F.3d 1 (1st Cir. 2015) ...................................69

United States v. Lambinus, 747 F.2d 592 (10th Cir. 1984)..........................71

United States v. Laureano-Perez, 797 F.3d 45 (1st Cir. 2015).....................89

United States v. Lawson, 368 F. App'x. 1 (11th Cir. 2010).........................52

United States v. Lebron Cepeda, 324 F.3d 52 (1st Cir. 2003)......................36

United States v. Long, 870 F.3d 741 (8th Cir. 2017)..................................52

United States v. Madera-Ortiz, 637 F.3d 26 (1st Cir. 2011)........................92

United States v. Mala, 7 F.3d 1058 (1st Cir. 1993) ..........................50, 58, 68

United States v. Maldonado-Pena, 4 F.4th 1 (1st Cir. 2021).................. 80, 87

United States v. Martin, 520 F.3d 87 (1st Cir. 2008)............................. 92-93

United States v. Martinez, 994 F.3d 1 (1st Cir. 2021)............................ 60-61

United States v. Mason, 951 F.3d 567 (D.C. Cir. 2020)...............................49

United States v. Misla-Aldarondo, 478 F.3d 52 (1st Cir. 2007)....................49

United States v. Monteiro, 871 F.3d 99 (1st Cir. 2017)..............28, 34, 36, 38

United States v. Murphy, 193 F.3d 1 (1st Cir. 1999) ....................................71

United States v. Nason, 9 F.3d 155 (1st Cir. 1993)......................................57

United States v. Navarro, 263 F. App'x 428 (5th Cir. 2008) ........................52

United States v. O'Bryant, 998 F.2d 21 (1st Cir. 1993) ...............................56

United States v. Orlandella, 96 F.4th 71 (1st Cir. 2024) .........................47-48

United States v. Ortiz-Mercado, 919 F.3d 686 (1st Cir. 2019).....................93

United States v. Ortiz-Perez, 30 F.4th 107 (1st Cir. 2022) ...........................91

United States v. Osborne, 514 F.3d 377 (4th Cir. 2008)...............................86

United States v. Pabon, 819 F.3d 26 (1st Cir. 2016)...............................70, 78

United States v. Palacios, 810 F. App'x 747 (11th Cir. 2020)......................82

United States v. Pantojas-Cruz, 800 F.3d 54 (1st Cir. 2015) .......................77

United States v. Patton, 14 F. App'x 450 (6th Cir. 2001)............................88

United States v. Pelletier, 666 F.3d 1 (1st Cir. 2011) ..................................66

United States v. Pena-Lora, 225 F.3d 17 (1st Cir. 2000) .............................55

United States v. Peña–Lora, 225 F.3d 17 (1st Cir. 2000).............................39

United States v. Perez-Vasquez, 6 F.4th 180 (1st Cir. 2021) ........................63

United States v. Peters, 732 F.2d 1004 (1st Cir.1984) .................................52

United States v. Ponzo, 853 F.3d 558 (1st Cir. 2017).....................................55

United States v. Ramos-Baez, 86 F.4th 28 (1st Cir. 2023)...................... 26, 35

United States v. Raymundí-Hernández, 984 F.3d 127 (1st Cir. 2020)..........47

United States v. Reifler, 446 F.3d 65 (2d Cir. 2006)............................... 39, 42

United States v. Reynos, 680 F.3d 283 (3rd Cir. 2012) ...............................86

United States v. Rijos-Rivera, 53 F.4th 704 (1st Cir. 2022) .....................82-83

United States v. Rivera-Figueroa, 149 F.3d 1 (1st Cir.1998).......................32

United States v. Rivera-Morales, 961 F.3d 1 (1st Cir. 2020) ........................91

United States v. Rodríguez-Adorno, 695 F.3d 32 (1st Cir. 2012).................30

United States v. Rodriguez-Berríos, 573 F.3d 55 (1st Cir. 2009).................31

United States v. Rodriguez-Marrero, 390 F.3d 1 (1st Cir. 2004).................56

United States v. Rodriguez-Monserrate,
    22 F.4th 35 (1st Cir. 2021) .......................................... 70, 77-78

United States v. Romero, 906 F.3d 196 (1st Cir. 2018) ...............................69

United States v. Ruiz-Huertas, 792 F.3d 223 (1st Cir. 2015)...................91-92

United States v. Santa-Soler, 985 F.3d 93 (1st Cir. 2021).............................92

United States v. Santiago Rivera, 744 F.3d 229 (1st Cir. 2014) ...................90

United States v. Sepúlveda-Hernández, 817 F.3d 30 (1st Cir. 2016) ...........91

United States v. Sevilla-Oyola, 770 F.3d 1 (1st Cir. 2014) .......... 65, 80, 87, 89

United States v. Smith, 46 F.3d 1223 (1st Cir. 1995) ...................................57

United States v. St. Cyr, 977 F.2d 698 (1st Cir.1992)...................................77

United States v. Sweeney, 887 F.3d 529 (1st Cir. 2018)..............................27

United States v. Taylor, 128 F.3d 1105 (7th Cir. 1997) ...............................85

United States v. Tiem Trinh, 665 F.3d 1 (1st Cir. 2011)..............................55

United States v. Tirado-Nieves, 982 F.3d 1 (1st Cir. 2020)...................77, 81

United States v. Van Anh, 523 F.3d 43 (1st Cir.2008) ..........................49, 51

United States v. Vélez-Soto, 804 F.3d 75 (1st Cir. 2015)..............................76

United States v. Veloz, 948 F.3d 418 (1st Cir. 2020)...................................63

United States v. Viloria-Sepúlveda, 921 F.3d 5 (1st Cir. 2019)...................76

United States v. Whooten, 279 F.3d 58 (1st Cir. 2002)...............................84

United States v. Williams, --- F.4th ----, No. 21-1493,
    2023 WL 5362440 (1st Cir. Aug. 22, 2023) ..............................................37

United States v. Zannino, 895 F.2d 1 (1st Cir. 1990)..........................passim

United States v. Zimny, 873 F.3d 38 (1st Cir. 2017)..............................61-62

Whorton v. Bockting, 549 U.S. 406 (2007)...................................................64

Zafiro v. United States, 506 U.S. 534 (1993) .........................................56-57

# FEDERAL STAUTUTES

18 U.S.C. § 2 ...................................................................................27

18 U.S.C. § 2119.......................................................................... 32, 36

18 U.S.C. § 3231 ...............................................................................1

18 U.S.C. § 3553(a)(1)......................................................................90

28 U.S.C. § 1291 ...............................................................................1

# FEDERAL SENTENCING GUIDELINES

U.S.S.G § 1B1.3(a)(1)..................................................................... 80, 88

U.S.S.G § 4A1.2(a)(1) .......................................................................78

U.S.S.G § 4A1.2(a)(2) .......................................................................79

U.S.S.G. § 1B1.1 ...............................................................................80

U.S.S.G. § 1B1.1 cmt. 1(M) ...............................................................82

U.S.S.G. § 1B1.1, cmt. n. 1(a) ...........................................................84

U.S.S.G. § 1B1.3 cmt. n. (D)..............................................................83

U.S.S.G. § 1B1.3(a)(1)(B)............................................................... 82, 88

U.S.S.G. § 2B3.1(b)(3)(B) ..................................................................80

U.S.S.G. § 2B3.1(b)(4)(A)...............................................................83-84

U.S.S.G. § 2B3.1, cmt. n. 1 ...............................................................84

## OTHER AUTHORITIES

Wayne R. LaFave, *Substantive Criminal Law* § 13.2 (2d ed. 2003) ................39

## FEDERAL RULES

Fed. R. App. P. 4(b)(1)(A) ...........................................................................1

Fed. R. Crim. P. 14(a)..............................................................................56

# JURISDICTIONAL STATEMENT[1]

The district court had original jurisdiction of the federal offenses charged and tried against defendants-appellants Anthony Rivera-Rivera, Victor M. Hernández-Carrasquillo, and Jimmy Ríos-Alvarez. 18 U.S.C. § 3231. They each filed their notices of appeal within 14 days of entry of their respective judgments. (DE 810 and 816; DE 838 and 847; DE 851 and 853); Fed. R. App. P. 4(b)(1)(A). This Court has jurisdiction of these consolidated appeals from those final judgments. 28 U.S.C. § 1291.

---

[1] Citations to "DE" refer to docket entries in the underlying criminal case; "Riv. AB," to Rivera's Brief; "Her. AB" to Hernández's Brief; and "Rio. AB" to Río's Brief. Per this Court's order in Rivera's appeal, the United States' record citations will refer to the docket in the underlying criminal case only. *See* Order, *United States v. Rivera-Rivera*, No. 22-1982 (1st Cir. Oct. 26, 2023).

I.   Whether a rational jury could have found Rivera, Hernández, and Ríos guilty beyond a reasonable doubt.

II.  Whether the district court abused its discretion by denying Rivera's *Brady* challenge.

III. Whether the district court abused its discretion by not severing Rivera's trial from Ríos's.

IV.  Whether Rivera's Confrontation Clause rights were violated at trial.

V.   Whether the district court gave Rivera and Hernández reasonable sentences.

STATEMENT OF THE CASE

**A.   Rivera, Hernández, Ríos, and three others invade a home at gunpoint, ransack the home, torture its residents, and carjack their pick-up truck**

A speeding black Mitsubishi Lancer broke to a halt in front of a house in Carolina, Puerto Rico. (DE 562 at 46; DE 669 at 17-18; DE 670 at 32). Rivera, Hernández, Ríos, Wilmed Suárez, Jeremy Guzmán, and José Correa, masked and gloved, planned to take money and valuables from the family who lived there. (DE 562 at 15-18, 50-62). All except Suárez carried guns. (DE 562 at 41, 70).

69-year-old Carmen Morales and her young-adult son, Antonio Gómez, were pruning trees in the front garden. (DE 562 at 46; DE 670 at 32). Armed and masked housebreakers rushed out of the Lancer. (DE 562 at 46; DE 669 at 18; DE 670 at 32). One of them pushed and grabbed Carmen by the arm. (DE 669 at 18-19; DE 670 at 33). Another pointed a gun at Antonio, then pressed it to his temple. (DE 669 at 18; DE 670 33). They forced them to run across the long yard, inside the house, and up the stairs to the second floor living room. (DE 562 at 46-48; DE 669 at 18-20; DE 670 at 32-33).

Along the coerced mad dash from the front garden to the living room, Carmen struggled to keep pace, but her grabber manhandled her when she

tried to stop at a tree to catch her breath. (DE 669 at 19). She told him she was elderly. (DE 669 at 20). The hostage-takers pushed and dragged her up the stairs once they reached the house. (DE 669 at 20).

Carmen's other son, Luis Emilio Gómez, came out of a room on the first floor, arms raised in surrender, and pleaded with the masked assailants to not harm his mother and younger brother. (DE 562 at 47; DE 669 at 19; DE 670 at 33). Ríos forced him up the stairs to the living room too. (DE 562 at 47). The robbers punched Luis Emilio in the face, chest, and stomach. (DE 669 at 20). They hit him on the head with a gun. (DE 669 at 20).

In the living room, Carmen "saw them so violent, [she] told them that [she and her sons] didn't have any money" and said she would give them ATM cards from which they could make withdrawals. (DE 669 at 21). One of them put a fist to her face and pushed her onto a couch. (DE 669 at 21).

Another gunman pushed Antonio into a bedroom, (DE 669 at 20; DE 670 at 34), where he asked him for valuables. (DE 670 at 34). When Antonio responded he could only offer his ATM card, he hit him in the head with a gun. (DE 670 at 34). "He continued hitting [him.]" (DE 670 at 34). He threw him to the ground, kicked him and left the room. (DE 670 at 34).

Back in the living room, the assailants kept on beating Luis Emilio in front of Carmen. (DE 669 at 24). They tied his arms behind his back, taped his mouth, and sat him on an armchair. (DE 669 at 24; DE 670 at 35).

Antonio "came back to [his] senses in the hallway," where they also tied him up and taped his mouth.[2] (DE 670 at 34-35). They threw him forward on the hallway floor. (DE 669 at 24; DE 670 34-35). From there, Antonio could see into the living room, and Carmen could see him. (DE 669 at 24; DE 670 34-35). Every time the hostage-takers would walk past him on the floor, they would kick him. (DE 669 at 24; DE 670 at 25).

Rivera, Hernández, Ríos, and their cohorts continued asking for money and valuables. (DE 669 at 25; DE 670 at 36). They ransacked the house, tearing up the rooms on both floors in their search for spoils while Suárez remained in the living room, watching over the victims. (DE 562 at 48; DE 669 at 25-26; DE 670 36-37). At one point, they went through the family's cars and "turned them upside down." (DE 669 at 26). The robbers "were moving throughout the whole house during the whole time." (DE 669 at 26). Carmen observed that "they were incredibly organized." (DE 670 at 5). They

---

[2] The tape was later removed from Luis Emilio's and Antonio's mouths. (DE 669 at 25; DE 670 at 36).

confronted the family with a revolver Ríos found in a bedroom and a box of old cancelled checks that was found in another room. (DE 669 at 27; DE 670 at 41). They insisted those items were proof of wealth. (DE 669 at 27; DE 670 at 41). Luis Emilio told them his grandfather had owned a dairy farm at one point, but that the family no longer had money. (DE 669 at 27; DE 670 at 41).

"Everybody was looking throughout the house, and since they couldn't find any money or anything, then they went ahead and started heating oil in the pan."[3] (DE 652 at 49). They poured the boiling oil on Luis Emilio's and Antonio's thighs and feet. (DE 562 at 49, 70; DE 669 at 25-26; DE 670 at 41-3). They screamed in pain. (DE 670 at 42). Carmen, distraught, yelled. (DE 670 at 42). Guzmán then took a knife from the kitchen and stabbed Luis Emilio in the thigh. (DE 562 at 49; DE 669 at 26; DE 670 at 43). At some point, Antonio was stabbed in the leg too. (DE 670 at 48).

Carmen heard Rivera, Hernández, Ríos, and their cohorts ask: "Well what do we do now? Do we take the old lady?" (DE 669 at 27). "No. Take me," Luis Emilio said. (DE 669 at 27). He was taken away from the living room, down to the first floor. (DE 669 at 28; DE 670 at 51). "They wanted to

---

[3] Correa was the one who had the pan when heating the oil. (DE 562 at 49).

put him in one of the vehicles … from the house" (DE 652 at 50), because "they wanted to kidnap him and bring him to the closest ATM machine." (DE 652 at 54).

The hostage-takers put Luis Emilio in one of the family's vehicles, a blue Nissan Frontier pick-up truck, but Suárez took him out. (DE 652 at 54). There were four vehicles at the house, but the Frontier was the one that was "at the entrance." (DE 669 at 29). Suárez and Guzmán then got into the Frontier and headed to an ATM machine at a gas station with an ATM card belonging to one of the victims. (DE 652 at 55). Carmen, Luis Emilio, and Antonio remained in the house with Rivera, Hernández, Ríos, and Correa. (DE 652 at 55). At the gas station, Guzmán called the four gunmen to procure the ATM card pin number, then withdrew the money. (DE 652 at 55-56; DE 659 at 27-35). Correa was the one speaking on the phone when Guzmán called for the pin. (DE 652 at 70). Before leaving the house, Rivera, Hernández, Ríos, and Correa tied Carmen up, hands and feet. (DE 669 at 28).

Suárez and Guzmán, in the Frontier, began driving back to the house but, on the road, ran into Rivera, Hernández, Ríos, and Correa in the Lancer. (DE 562 at 56-57). They rendezvoused at a supermarket parking lot so Guzmán could switch cars to the Lancer. (DE 562 at 57). They drove the

Frontier and the Lancer to a public housing project and went their separate ways. (DE 562 at 57-58).

After the gunmen left, the house was dead silent. (DE 670 at 12). There were blood stains and puddles of blood on the floor. (DE 669 at 31, 37-39; DE 670 at 37-40). Luis Emilio called out to Carmen: "Mom, please help me; I'm bleeding out." (DE 669 at 30). Carmen, "somehow," untied herself. (DE 669 at 31; DE 670 at 12-13). She rushed her sons to the hospital. (DE 670 at 13).

## B. Rivera, Hernández, and Ríos are charged; opt for trial

In 2016, a grand jury charged Rivera, Hernández, Ríos, and four others, as both principals and aiders and abettors, with carjacking and using a firearm during and in relation to a crime of violence.[4] (DE 89). The district court scheduled a jury trial as to the charges against Rivera, Hernández, and Ríos for May 23, 2022. (DE 420).[5]

## C. Rivera moves for severance and challenges a perceived *Brady* violation; loses both motions

On May 18, 2022, the United States produced a discovery package to Rivera, Hernández, and Ríos. (DE 512; DE 546). The package included FBI

---

[4] In violation of 18 U.S.C. §§ 2, 2119(2) and 924(c)(1)(A)(ii).

[5] The other co-defendants pleaded guilty.

lab reports and reports of interviews and videos conducted with several of Rivera's co-defendants, including Suárez. (DE 512; DE 546). The United States maintained that the package re-disclosed materials previously provided in discovery, out of an abundance of caution. (DE 546 at 3). Then, on May 23, after the district court continued the trial on the United States' motion, another discovery package was provided to Rivera. (DE 543). It contained recordings of Ríos's second interview (the first had already been disclosed) and another of Reynaldo Meléndez-López, another co-defendant in this case. (DE 543 at 3-4).[6] Rivera moved to dismiss the indictment, contending these disclosures constituted *Brady* violations. (DE 512; DE 543).

The district court held a lengthy hearing as to the *Brady* allegations on May 31. (DE 589). After hearing the parties, the court held that "in [its] mind this [was] *Brady* material, or arguably, *Brady* material. That triggers disclosure." (DE 589 at 169). The court continued trial until June 27 – over a month after the May 18 and 23 disclosures. (DE 589 at 108). The district court further expressed that Rivera had not supplied support for dismissal of the

---

[6] The United States provided Rivera with reports of investigation, transcripts, and certified translations of these interviews on May 31. (DE 579 at 3).

indictment as a remedy. (DE 589 at 167). The district court ordered the parties to file supplemental briefing on the matter. (DE 589 at 169-70).

In a written motion, Rivera urged the district court to use dismissal as a tool to castigate the United States and prevent future *Brady* issues. (DE 579 at 3-7). The United States, in turn, advanced that Rivera had failed to establish how any late disclosures prejudiced him, cited extensive caselaw that weighed against dismissing the indictment, and emphasized that Rivera had ample time – indeed, weeks – before trial to study and utilize the materials provided in discovery. (DE 587 at 2-8). The court denied Rivera's motion to dismiss, noting it was "persuaded by the substance of the government's analysis." (DE 613 at 1).

Following the suppression of Ríos's second interview (which contained statements exculpating Rivera) on his motion, (DE 613 at 1), Rivera moved to sever his trial from Ríos. (DE 618). He alleged that a joint trial would prevent him from eliciting testimony as to those exculpatory statements and that additional evidence presented against Ríos would prejudice him as well. (DE 618 at 2-8).

The United States retorted that Rivera failed to establish that Ríos would in fact testify if the cases were severed and did not raise any argument

as to another requisite part of the *Drougas* framework analysis. (DE 622). The district court denied Rivera's motion and expressed its agreement with the United States' arguments. (DE 625).

## D.   The evidence is presented to a jury at trial

At trial the United States presented Suárez's testimony. (DE 562; DE 569). He testified about how he schemed to rob Carmen and her sons, and how he set his plan in motion. (DE 562 at 15-18). He talked about meeting up with his confederates and making his way to the house with them, initially in two separate cars before piling into the Lancer together. (DE 562 at 18-19, 40-46). He spoke of taking the family hostage, witnessing Luis Emilio's and Antonio's torture, becoming frustrated along with the other gunmen when they did not find the money they were looking for, deciding with the others to take a car and ATM cards from the family to withdraw money at a gas station, and doing so. (DE 562 at 46-62). He identified Rivera, Hernández, and Ríos as three of the gunmen involved in the violent home invasion and carjacking. (DE 562 at 15, 17).

The United States also presented Carmen's testimony. (DE 669; DE 670). She spoke about the ordeal she and her sons went through. (DE 669; DE 670). She also identified Rivera and Hernández. (DE 669 at 53-55).

Carmen testified that Rivera "was the one that grabbed [her] and controlled [her] during the whole time, who made [her] run." (DE 669 at 52).[7] She described how the hostage-takers took her and Antonio violently from her front yard to the living room and Luis Emilio from the first floor, beat and tortured her sons, ransacked her house, and decided to take Luis Emilio from the living room to go retrieve money from an ATM machine. (DE 669 at 18-28). She also talked about untying herself to find Luis Emilio bleeding out on the first floor and rushing him and Antonio to the hospital. (DE 669 at 30-31). Carmen testified that the ordeal lasted "three long hours." (DE 669 at 26; *see also* DE 669 at 40, 52).

Antonio testified too. (DE 670). His testimony recounted the robbery as well, but from his point of view. (DE 670). In addition, the United States presented, *inter alia*, photographs taken at the house after the home invasion and carjacking, (DE 669 at 29, 36-40), at evidence of the Frontiers travel in interstate commerce, (DE 694 at 9-10), video of the ATM machine cash

---

[7] Rivera references this statement throughout his brief for the mistaken proposition that his participation in the offense was limited to watching over Carmen throughout the entire ordeal. But, read in context, this statement only establishes that Rivera controlled Carmen the "whole time" they were forcing her and Antonio inside the home.

withdrawal (including footage of Guzmán talking on the phone), (DE 663 at 27-35), video of Guzmán's switch from the Frontier to the Lancer at the supermarket parking lot, (DE 663 at 35-39), evidence of lineup identifications of Rivera and Hernández, (DE 694 at 16-36, 96-102), stolen items taken from the family recovered from the cars the robbers used, (DE 678 at 13-15), and evidence of Luis Emilio's and Antonio's injuries and the treatment they received, (DE 669 at 46-49; DE 670 at 42, 46-47).

An FBI agent also testified as to an interview conducted with Ríos. (DE 663 at 42-53; DE 694 at 40-43). The agent testified about Ríos's admissions during that interview, including Ríos thinking Guzmán was heating up water instead of oil (DE 663 at 51-52), watching Guzmán and Suárez leave in the Frontier, (DE 663 at 52), knowing they were headed to withdraw cash from an ATM, (DE 663 at 52), and about Guzmán calling to obtain the ATM card pin number, (DE 663 at 52).

**E.    Rivera, Hernández, and Ríos raise specific arguments to challenge the sufficiency of the evidence at the close of the United States' case and at the close of all the evidence**

At the closing of the United States' case, Rivera, Hernández, and Ríos presented motions for acquittal. (DE 671, 672, and 673).

Rivera insisted that there was "no evidence as to the assailants having the initial intent to carjack the victims and cause serious bodily harm." (DE 671 at 5). He maintained that "the evidence presented to the jury has been that the assailants took the car as they were leaving the house. It was an incidental issue, not the purpose of the home invasion." (DE 671 at 6). Hence, he argued, the United States had only proved that he was guilty of a robbery under state law. (DE 671 at 7). He concluded: "Nothing in the evidence presented by the Government can prove beyond a reasonable doubt that [Rivera] aided and abetted [Suárez] willfully, intentionally, and knowingly to carjack the vehicle taken in this case. The evidence has shown that in less than a few seconds Mr. Suárez-Diaz decided to take the car without consulting with his co-defendants." (DE 671 at 8). Rivera also posited that he had been misidentified. (DE 671 at 8-11).

Hernández argued that the United States had not proven that the defendants intended "to cause death or serious bodily harm at the time they demanded or took control of the car." (DE 672 at 4). He conceded there was proof that the defendants intended to cause such harm as it related to the home invasion but contended that there was no evidence they harbored the same intent as it pertained to the taking of the Frontier. (DE 672 4-5). He also

posited that there was no proof the defendants "demanded" the Frontier, and that they only took it out of convenience. (DE 672 at 5). Thus, he concluded, the United States had proven a state law aggravated robbery, but not a federal carjacking. (DE 672 at 6).

Ríos argued that evidence that he "allegedly was part of the 'team'" was "not sufficient to prove he aided and abetted in the robbery of a vehicle that was unknown to him." (DE 673 at 4). He also contended that there was no "testimony from the victims that the vehicle was taken by force and violence or intimidation." (DE 673 at 4). He categorized the torture and abuse visited upon the victims as pertaining only to robbery. (DE 673 at 4). Finally, Ríos contended that there was no evidence that he knew Suárez and Guzmán would take the Frontier, that he had "taken affirmative step to help" them, or that he "had advance knowledge … to allow him to walk away." (DE 673 at 5). All three of the defendants also argued that if the carjacking count were dismissed, the court would need to dismiss the firearm count as well.

After hearing the government, the district court denied the three motions. The defense then presented two witnesses that spoke about the absence of DNA and fingerprint evidence in the Lancer and rested. (DE 704; DE 724). The three defendants renewed their motions for acquittal. (DE 869).

Rivera told the court he would rely on the same "reasoning" raised in his original motion for acquittal. (DE 869 at 3 (citing DE 671)). He then added that he lacked "advance knowledge" of the carjacking offense (DE 869 at 4-5). He thus argued that there was no evidence that he had the requisite mens rea to aid and abet a carjacking because there was no proof he knew of a carjacking before arriving at the house. (DE 869 at 6-7).

Hernández joined the argument Rivera presented and restated those in his own original motion for acquittal. (DE 869 at 8). He also bemoaned that he had "been a victim of misidentification." (DE 869 at 9). Ríos joined his co-defendants' arguments and restated those in his own original motion too. (DE 869 at 10-11 (citing DE 673)). The United States responded. (DE 689 at 13-20). The district court took the motions under advisement, and eventually denied them.

**F.    The jury convicts Rivera, Hernández, and Ríos on both counts**

After deliberation, the jury returned its verdict. It found Rivera, Hernández, and Ríos guilty as to all counts. (DE 862 at 2-4).

**G.    The district court sentences Rivera**

A probation officer prepared a presentence report. (DE 779). The report calculated, as to the carjacking count, a total offense level of 30 after adding

a two-level enhancement and two four-level enhancements to a base offense level of 20. (DE 779 at 10). One four-level enhancement was added because a victim sustained a serious bodily injury and another because a victim was abducted. (DE 779 at 10 (citing U.S.S.G. §§ 2B3.1(b)(4)(A) and 2B3.1(b)(5))). The report also placed Rivera in the criminal history category of I, but specified that Rivera's criminal history points would change upon him being sentenced in Criminal Case No. 15-539 (PAD). These calculations yielded a guideline sentencing range of 97 to 121 months as to the carjacking count and 84 consecutive months as to the firearm count. (DE 779 at 11, 17).

Rivera objected to the application of both four-level enhancements. (DE 789; DE 797). He maintained that the injury established at trial comported with the definition of "bodily injury" rather than the definition of "serious bodily injury." (DE 789 at 2-3). He also argued that nobody was abducted because they were not taken out of the house. (DE 789 at 3).

The United States filed its own sentencing memorandum. (DE 794). Therein, it posited that the serious bodily injury applied because, at trial:

> testimony was heard that hot oil was poured onto the feet and thighs of the two male victims; that one of the male victims was stabbed with a knife on the thigh and was bleeding out; that the male victims were kicked, punched in the face, chest, and stomach; that one of the male victims was hit in the head with a

gun; that the victims were tied up; that the male victims' noses and mouths were taped and they could not breathe; that the stab victim suffered a lot of blood loss.

(DE 794 at 3). And it pointed out the medical treatment required for and persisting effects of those injuries. (DE 794 at 3). The United States also argued in favor of the abduction enhancement because "the victim was abducted, transported from the second level of the residence to the first level, and into a vehicle." (DE 794 at 4). "That the individuals then decided to leave the male victim does not negate the fact that he was abducted," it added. (DE 794 at 4).

The probation officer rejected Rivera's challenge to the serious bodily injury enhancement, echoing the United States's position. (DE 797 at 2). And she rejected the objection to the abduction enhancement because Luis Emilio was placed inside the vehicle. (DE 797 at 2).

At sentencing, Rivera switched his argument up, contending that the serious bodily injury did not apply because others inflicted the injuries and "[n]obody who sat in the witness chair stated that [Rivera] either touched them or had anything to do personally with them." (DE 863 at 19). He argued against the abduction enhancement, maintaining that nobody was abducted. (DE 863 at 24). He also modified his previous arguments, adding that he did

not participate in any alleged abduction of Luis Emilio. (DE 863 at 25). The United States disagreed, stating that Rivera was rehashing arguments already rejected at trial. (DE 863 at 33). It posited that Rivera was responsible for both the serious bodily injuries inflicted and the abduction because he aided and abetted those acts. (DE 863 at 35-36).

The district court applied both enhancements. (DE 863 at 42). It found that "the victim sustained a serious bodily injury" and "that the victim was abducted," explaining that the defendants "attacked a two-story structure leading to a carjacking. It was predictable, what happened." (DE 863 at 42). It also determined a criminal history category of II because Rivera "received three criminal points for the conviction and sentence in Case 15-539." (DE 863 at 42). After weighing the sentencing factors, (DE 863 at 43-44), it sentenced Rivera to a low-end-of-the-guidelines 108 months in prison as to the carjacking count and 72 consecutive months as to the firearm count (an illegal sentence below the statutory minimum), for a total of 180 months concurrent to his 51-month sentence in the other case. (DE 863 at 43-44, 9). Rivera did not lodge any objections to his sentence.

## H. The district court sentences Hernández

A probation officer prepared a presentence report. (DE 788). The report calculated, as to the carjacking count, a total offense level of 30 using a calculation identical to Rivera's. (DE 788 at 10-11). The report, however, placed Hernández in the criminal history category of V due to possessing 11 criminal history points. (DE 788 at 14). These calculations yielded a guideline sentencing range of 151 to 188 months as to the carjacking count and 84 consecutive months as to the firearm count. (DE 788 at 11, 19). The report also detailed Hernández's personal characteristics and history. (DE 788 at 15-18).

Hernández filed a sentencing memorandum. (DE 805). Therein, he objected to several provisions in the presentence report, (DE 805 at 2-5), argued for a sentence concurrent to his other convictions, (DE 805 at 5-10), argued for a lower sentence and an alternative guideline calculation based on his participation as compared to his codefendants (DE 805 at 10-13), affirmed he did not take responsibility for the offense, (DE 805 at 13), reaffirmed his trial objections, (DE 805 at 14), and urged the district court to use the sentencing factors to impose a low sentence but without detailing how any of these factors favored him, (DE 805 at 14-15). The United States,

in turn, filed a memorandum emphasizing the troubling and violent circumstances of the offense and Hernández's participation. (DE 815 at 4-7).

At the start of Hernández's sentencing hearing, the district court said it had considered the presentence report, its addendum, and the parties' respective sentencing memorandums. (DE 866 at 4). Hernández then reiterated his argument for concurrent sentences and his objections to the presentence report. (DE 866 at 5-14). The court then told Hernández that his "memo [was] well written, [was] very clear," stressed that it "reviewed it" and that it "underst[ood] [his] arguments," and urged him to "highlight" "anything beyond what [he'd] said." (DE 866 at 14). Hernández then conceded that "the facts of this case are very disturbing" but urged the court to use its discretion "to fashion a sentence that reflects the activities that he actually did or that he actually partake [sic] of during that day." (DE 866 at 15). The United States emphasized the seriousness of the offense. (DE 866 at 21). The court then agreed with the presentence report's calculations, (DE 866 at 29-30), and imparted its sentence:

> [W]ith regard to the 3553(a) factors, as indicated in the presentence report, Mr. Hernández is a 31-year-old United States citizen, resident of Trujillo Alto, Puerto Rico. He has no dependents.

At the time of the arrest, he was self-employed as a barber and working at a place called "Bosquesito Familiar." He has a ninth-grade education. He disclosed being physically and mentally healthy, as well as having a substance abuse history, specifically of marijuana.

This is his sixth known arrest and fourth conviction, first federal. Mr. Hernández, aiding and abetting, participated in the robbery of a vehicle by intimidation, force and violence, with the intent to cause death or serious bodily harm, while carrying a firearm.

With this background, taking all aspects of the case into account, the Court is persuaded that a sentence at the lower end of the guideline range would be sufficient and not greater than necessary to promote the objectives of sentencing. Therefore, on the judgment of the Court, Mr. Victor Hernández is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 151 months as to Count One, and 72 months as to Count Two, to be served consecutively to each other, for a total imprisonment term of 223 months.

(DE 866 at 30-31). The district court later corrected Hernández's sentence as to the firearm count, raising it to 84 months in prison because 72 months would result in an illegal sentence. (DE 866 at 34-35). He objected to the sentence "for being substantive [sic] and procedurally unreasonable." (DE 866 at 36).

These consolidated appeals follow.

## SUMMARY OF THE ARGUMENT

The trial evidence sufficiently established that the appellants committed the charged carjacking, both as principals and as aiders and abettors. The requisite intent to cause death or serious bodily injury was ably met through proof of the assailants being armed and of their vicious and escalating attacks on Carmen, Antonio, and Luis Emilio. And, at the very least, the appellants acted to help the carjacking with the intent to do so. A rational jury could thus find their guilt beyond a reasonable doubt.

Rivera's other claims are marred by a variety of waivers. In any event, he did not suffer a *Brady* violation because he had ample time to prepare and effectively use the disclosed materials after the court issued a lengthy continuance. He does not and cannot establish prejudice. His severance challenge fails too: He fails to establish that Ríos would have testified, and his spillover arguments hold no water. He neglects to show that the statements he complains violated *Crawford* were testimonial hearsay. Regardless, admission of most was harmless beyond a reasonable doubt.

The district court correctly calculated Rivera's total offense level and criminal history category. Hernández's bottom-of-the-guidelines sentence is reasonable too.

# ARGUMENT

## I. The United States sufficiently proved that Rivera, Hernández, and Ríos aided and abetted a carjacking and carried firearms in furtherance of that carjacking.

### Issue

Rivera argues that the principals who took the Frontier from Carmen, Luis Emilio, and Antonio lacked the conditional intent to cause death or serious bodily injury at the time of the taking. (Riv. AB 33-36). He also maintains that there is no evidence that he acted to help them complete the carjacking, intended to help them complete the carjacking, or shared their knowledge as to the carjacking. (Riv. AB 36-38).

Hernández, in turn, complains that the United States did not prove he "commented, agreed or said anything related to a carjacking, prior to arriving at the victim's house." (Her. AB 32). He also bemoans there is no evidence he intended to cause death or serious bodily injury at the moment of the Frontier's taking. (Her. AB 32). He also contends that he was misidentified but concedes that Carmen identified him. (Her. AB 32-33). His brief also includes a copy-paste of his first motion for acquittal below. (Her. AB 33-37). Those arguments are detailed above. *See*, *supra*, p. 13-16.

Ríos argues that Suárez's testimony establishes an agreement to "rob money" but "at no time did he testify a carjacking was agreed to either before getting to the house or while in the house." (Rio. AB 13). He insists the carjacking occurred without his knowledge. (Rio. AB 14). Therefore, he maintains, the United States failed to prove he had "the required intent to commit the crime of carjacking as a principal [or] as an aider and abettor." (Rio. AB 14). He posits that there is no proof he "consciously shared principals [sic] knowledge of the underlying criminal act and intended to help the principal." (Rio. AB 15).

All three contend that if their challenges to the carjacking convictions are successful, the firearm convictions must also fall. (Riv. AB 38; Her. AB 37; Rio. AB 17-19).

## Standard of Review

This Court reviews properly preserved challenges to the sufficiency of the evidence de novo. *See United States v. Buoi*, 84 F.4th 31, 37 (1st Cir. 2023). A defendant raising such a challenge "faces an uphill battle on appeal." *United States v. Hernández*, 218 F.3d 58, 64 (1st Cir. 2000). The inquiry centers on "whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Falcón-Nieves*, 79 F.4th 116, 123 (1st Cir. 2023) (cleaned up).

This Court does not weigh the evidence or make credibility judgments. *United States v. García-Pastrana*, 584 F.3d 351, 367 (1st Cir. 2009). It "will uphold the jury's verdict as long as it is supported by a plausible rendition of the record." *Id.* Circumstantial evidence is enough to uphold a challenged conviction, though the Court "may not pursue a divide and conquer strategy in considering whether the circumstantial evidence in the record adds up" or "stack inference upon inference" to uphold a verdict. *United States v. Ramos-Baez*, 86 F.4th 28, 48 (1st Cir. 2023) (cleaned up). Still, the evidence is considered "'in its totality, meaning that individual pieces of evidence that might not be enough on their own might add up to tell the tale of a defendant's guilt beyond a reasonable doubt." *United States v. Guerrero-Narvaez*, 29 F.4th 1, 9 (1st Cir. 2022) (cleaned up).

## Discussion

The jury properly found that Rivera, Hernández, and Ríos aided and abetted the carjacking of the Frontier during the home invasion and hold up

at Carmen, Luis Emilio, and Antonio's house. The United States presented evidence that established that at least one of the principals harbored the necessary mens rea to commit a carjacking, that Rivera, Hernández, and Ríos knew that a carjacking was being committed, and aided its commission by undertaking specific acts to do so with the requisite intent. Their arguments to the contrary are unavailing.

Aiding and abetting is not an offense but rather a theory of liability that draws no answerability distinction between a principal and an aider and abettor, thereby holding the latter fully accountable for the actions of the former as though they had committed all the elements of the offense themself. *See* 18 U.S.C. § 2; *United States v. Sweeney*, 887 F.3d 529, 541 (1st Cir. 2018). It dictates "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2.

To convict the appellants of aiding and abetting the carjacking, the United States needed to prove that a principal committed the carjacking. *See Falcon-Nieves*, 79 F.4th at 138. And it had to establish that Rivera, Hernández, and Ríos "associated" themselves with the carjacking "venture," "participated in [it] as something that [they] wished to bring about," and

"sought by [their] actions to make [it] succeed." *United States v. Monteiro*, 871 F.3d 99, 109 (1st Cir. 2017) (cleaned up). To satisfy the aiding and abetting liability scienter element, such participation required "advance knowledge of the elements that constitute the charged offense." *United States v. Encarnación–Ruiz*, 787 F.3d 581, 584 (1st Cir. 2015); *see also United States v. Ford*, 821 F.3d 63, 69 (1st Cir. 2016).

### A. Conditional Intent of the Principals

Rivera and Hernández first take aim at the United States' proof that a principal committed the carjacking.[8] They, wide of the mark, claim no evidence presented at trial establishes that a principal harbored the requisite mens rea.

The convictions at issue require proof a principal intended to seriously harm or kill Carmen, Luis Emilio or Antonio when they demanded or took control of the Frontier had it been necessary to successfully take it. *See United States v. Diaz-Rosado*, 857 F.3d 116, 121 (1st Cir. 2017) (quoting *Holloway v. United States*, 526 U.S. 1, 12 (1999)). This Court has held that the carjacking

---

[8] Ríos sits this round out. Indeed, while he briefly posits that he himself did not possess the requisite mens rea to complete a carjacking as a principal, he does not argue that neither did someone else. (Rio. AB 14).

statute's intent element is met when the principal touches or threatens a victim while brandishing a firearm. *Guerrero-Narvaez*, 29 F.4th at 10 (citing *United States v. Catalán-Roman*, 585 F.3d 453, 474 (1st Cir. 2009); *Díaz-Rosado*, 857 F.3d at 126 (Torruella, J., concurring) (citing more cases)). So have other circuit courts. *Id*. at 10-11 (collecting cases). The trial evidence fits that bill.

To be sure, Suárez testified that all the robbers except himself carried firearms. And the trial testimony of Suárez, Carmen, and Antonio establishes that the robbers brandished and used the firearms by pointing them at the victims and using them to bludgeon their heads. They continually touched and threatened Carmen, Luis Emilio, and Antonio. They punched, kicked, stabbed, burned with oil, and hit Luis Emilio and Antonio throughout the ordeal. That was enough to prove that all the robbers, and at least Guzmán and Suárez (who took and drove off in the Frontier), intended to cause serious bodily injury or death if necessary to achieve the taking of the Frontier.

Even if the United States had not introduced proof that the robbers carried, brandished, and used firearms, the trial evidence establishes that they harbored the requisite intent. At the very least, Guzmán and Suárez did. Undoubtedly, "[j]ust as one can use brute force or a variety of items to kill

or cause serious harm, one can also use such force or items to manifest an intent to cause death or serious harm if necessary." *Diaz-Rosado*, 857 F.3d at 121.

In *Diaz-Rosado*, the Court found the unarmed defendant's intent met the carjacking statute's requirement because he used violence from the outset of the encounter. *See id.* at 122 (quoting *United States v. Rodríguez-Adorno*, 695 F.3d 32, 42 (1st Cir. 2012)). *See also United States v. Garcia-Alvarez*, 541 F.3d 8, 16 (1st Cir. 2008). And "crucially," he employed "whatever force was necessary to accomplish his aim" at "each juncture of the incident." *Id.* The force progressively got worse throughout the ordeal. *Id.* So too here the evidence showed that the robbers used continuous and escalating violence from the outset of the incident up to its conclusion. They went from pointing firearms and manhandling the victims outside the house, to beating them up repeatedly, bludgeoning them with hard objects (guns), tying them up, pouring boiling oil on them, and stabbing them in the thighs inside the house. Rivera, Hernández, Ríos and their cohorts displayed a chilling willingness to employ deadly force and torture to achieve their ends throughout the entire time they occupied the victims' house. Evidence to that effect was more than enough to prove their conditional intent to cause

serious bodily injury or death. *See Garcia-Alvarez*, 541 F.3d at 16 ("Such conditional intent is more than amply established in this case by the fact that the assailants did, from their initial contact with [the victim], use force and inflict serious physical harm upon him.").

Rivera and Hernández nonetheless contend that these violent acts cannot inform the carjacking mens rea analysis because they are relevant only as to the home invasion and robbery. But this Court struck down a similar argument in *Garcia-Alvarez*. *See id.* at 16. Indeed, actions undertaken by the assailants against the victims even before the carjacking can inform and supply a finding of their conditional intent. *See United States v. Rodriguez-Berríos*, 573 F.3d 55, 66–67 (1st Cir. 2009) (highlighting "copious evidence of appellant's prior threats and physical assaults against the victim, from which a reasonable jury could conclude that appellant had the intent to seriously harm or kill [the victim] when he took control of her vehicle"). Here, they do. And that makes sense: It would be nonsensical to conclude that the hostage-takers' demonstrable intent to seriously harm or kill during the home invasion to obtain items of value, if needed to achieve their ends, suddenly disappeared when they decided to take a car from their bloodied victims as well. Even more so when the robbers displayed their willingness

to cause serious bodily injury or death (and actually inflicted serious bodily injury) at every juncture of the incident in order to take from Carmen, Luis Emilio, and Antonio whatever they wanted (be it cash, atm cards, valuable items or, as relevant here, a vehicle). A reasonable jury could only conclude they harbored the requisite intent.

Plus, to the extent the appellants argue that the taking of the Frontier was only incidental to the robbery, this Court has "previously said that 'nothing in the statute requires that the taking of a motor vehicle be an ultimate motive of the crime.'" *Garcia-Alvarez*, 541 F.3d at 16 (cleaned up) (quoting *United States v. Rivera-Figueroa,* 149 F.3d 1, 4 (1st Cir.1998)). "It is enough that the defendant be aware that the action in which he is engaged ... involves the taking of a motor vehicle." *Id.*

Hernández launches another errant salvo. He contends that nobody demanded the Frontier from the victims. But, even if he was right, the carjacking statute does not require a demand: it is enough that the carjackers take the vehicle from the victims. *See* 18 U.S.C. § 2119 ("Whoever, with the intent to cause death or serious bodily harm *takes* a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by

intimidation…" (emphasis added)); *Holloway*, 526 at 12 (requiring intent "at the moment the defendant demanded *or took control* over the driver's automobile"). That argument also ignores that the assailants had Luis Emilio tied up and were putting him in the Frontier before they drove off in it. Hernández does not contend or develop an argument that the assailants did not take control of the Frontier, thereby waiving it. *See United States v. Balser*, 70 F.4th 613, 617 (1st Cir. 2023) (arguments not raised in an opening brief are waived). And he also waives challenging that they did so through force and violence or intimidation. *Id.*

The United States thus sufficiently proved that at least one principal committed the carjacking.[9]

### B. *Acts of the Aiders*

Rivera, Hernández, and Ríos next contend that they did not act to aid the carjacking. They are, again, wrong. Indeed, they "associated" themselves with the carjacking "venture," "participated in [it] as something that [they]

---

[9] To boot, as will be explained below, (*see*, *infra*, 34-36, 35), a reasonable jury could conclude that Rivera, Hernández, and Ríos, as principals, were guilty of carjacking the Frontier.

wished to bring about," and "sought by [their] actions to make [it] succeed." *Monteiro*, 871 F.3d at 109 (cleaned up).

Carmen testified at trial that, after the assailants realized there was not more to take from the house, she heard Rivera, Hernández, Ríos, and their cohorts ask: "Well what do we do now? Do we take the old lady?" (DE 669 at 27). "No. Take me," Luis Emilio said. (DE 669 at 27). "They took him" from the living room, down to the first floor. (DE 669 at 28). Antonio also testified that the robbers took Luis Emilio to the first floor because "they wanted to take him … so that he could take money out from several ATMs." (DE 670 at 51). Suárez also testified, talking of his cohorts, that "[t]hey wanted to put him in one of the vehicles … from the house" (DE 652 at 50), because "they wanted to kidnap him and bring him to the closest ATM machine." (DE 652 at 54). Suárez further testified that he removed Luis Emilio from the Frontier after he was put inside, and then drove off in it with Guzmán to go retrieve the money. (DE 652 at 54-55).

Construing the evidence in the light most favorable to the jury's verdict requires interpreting each piece of testimony that refers to the assailants as a group (for example, referring to them as "they") as indicating that Rivera, Hernández, Ríos, and their cohorts all undertook the actions

described, which evince their knowledge and intent. *See e.g. Falcón-Nieves*, 79 F.4th at 123 (requiring "viewing the evidence in the light most favorable to the prosecution"). This is a single reasonable inference that requires no stacking to suffice. *See Ramos-Baez*, 86 F.4th at 48. Furthermore, it is consistent with the evidence introduced at trial that they went together to the house to, as a group, rob money and valuables, were highly organized and acted in concert by dividing and conquering to isolate the victims, search the house and cars, maintain control over victims, threaten and torture them into giving up their assets, and obtain cash and things of value.

Based on Carmen's, Antonio's and Suárez's testimonies, a reasonable jury could conclude that Rivera, Hernández, and Ríos participated in the carjacking as principals. Per the testimonies, they made the decision to take the Frontier (initially with Luis Emilio in it) so that crew members could retrieve money from an ATM machine, and took Luis Emilio from the living room and put him in the Frontier, thereby taking control of it from the victims.[10] Indeed, the carjacking statute does not require that a principal

---

[10] Damningly, Rivera, Hernández and Ríos do not develop arguments that they were not principals in the carjacking, thereby waiving them. *Balser*, 70 F.4th at 617.

drive off in the carjacked vehicle, but rather only that they "take" control of it. *See* 18 U.S.C. § 2119; *Holloway*, 526 at 12. And, at the very least, these were specific acts that aided and abetted the carjacking.[11] Testimony as to these acts was probative that Rivera, Hernández, and Ríos "associated" themselves with the carjacking "venture," "participated in [it] as something that [they] wished to bring about," and "sought by [their] actions to make [it] succeed." *Monteiro*, 871 F.3d at 109 (cleaned up).

Moreover, Rivera, Hernández, and Ríos continued to aid and abet the carjacking after Guzmán and Suárez had driven off in the Frontier.[12] "The law of this circuit is that 'the commission of a carjacking continues at least while the carjacker maintains control over the victim and [his or] her car.'" *United States v. Lebron Cepeda*, 324 F.3d 52, 61 (1st Cir. 2003) (quoting *Ramirez–*

---

[11] Any gunman left with Carmen and Antonio to ensure they remained tied up and compliant would still be acting towards the execution of that plan.

[12] Rivera and Hernández waive any argument to the contrary. They limit their arguments to the time of the taking. *See Balser*, 70 F.4th at 617; *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

*Burgos v. United States,* 313 F.3d 23, 30 n. 9 (1st Cir. 2002)).[13] So, the carjacking of the Frontier continued while Guzmán and Suárez had physical control of the vehicle and Rivera, Hernández, Ríos and Correa had physical control of the victims, so that the group, acting together, had dominion over both simultaneously.

During this time, per Carmen's, Antonio's, and Suárez's testimonies at trial, the four robbers at the house continued holding the victims hostage. (*See* DE 652 at 55). Guzmán called the four gunmen at the house to procure the ATM card pin number, then withdrew the money. (DE 652 at 55-56 ("And [Guzmán] made a call prior to withdrawing the money so that *they'd*

---

[13] Though this Court called this so-termed "abduction rule" into some question in *United States v. Figueroa-Cartagena*, it nonetheless applied it and did not overturn it. *See* 612 F.3d 69, 77-83 (1st Cir. 2010). The abduction rule continues to be the law of the circuit and binding here. *See United States v. Williams*, --- F.4th ----, No. 21-1493, 2023 WL 5362440, at *3 (1st Cir. Aug. 22, 2023) (quoting *United States v. Hudson*, 823 F.3d 11, 14 – 15 (1st Cir. 2016) ("'newly constituted panels … are constrained by prior panel decisions directly (or even closely) on point,' absent 'the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course'"); *United States v. Chhien*, 266 F.3d 1, 11 (1st Cir. 2001)). In any event, the appellants do not argue against its application here. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17.

provide him the digit numbers…" (emphasis added)).[14] And before leaving the house, Rivera, Hernández, Ríos, and Correa tied Carmen up, hands and feet. (DE 669 at 28). She testified that "at that point, that's when *they* tied me up. *They* tied me here, my hands and my feet. And they – and that we shouldn't talk, and the one that had custody of me said: Don't talk; don't talk." (DE 669 at 28 (emphasis added)).

These testimonies establish that Rivera, Hernández and Ríos undertook three additional specific acts: (1) they continued to hold the victims hostage while Guzmán and Suárez travelled to the ATM, (2) they communicated with Guzmán to provide the ATM card pin number, and (3) they bound Carmen to immobilize her after they left the house to further delay discovery of the carjacking and robbery. Through these they, again, "associated" themselves with the carjacking "venture," "participated in [it] as something that [they] wished to bring about," and "sought by [their] actions to make [it] succeed." *Monteiro*, 871 F.3d at 109 (cleaned up).

---

[14] Suarez testified that Correa was the one speaking on the phone when Guzman called for the pin, (DE 652 at 75), but based on his testimony that Guzman called so that *they* would provide him with the number, the four gunmen at the house were in communication with Guzman during that phone call.

Even if Rivera, Hernández, and Ríos only became involved after Guzmán and Suárez had left the house, when, like here, "the criminal conduct extends over a period of time, a latecomer 'may be convicted of aiding and abetting even if [they] did not learn of the crime at its inception but knowingly assisted at a later stage.'" *Figueroa-Cartagena*, 612 F.3d at 75 (alteration in original) (quoting *United States v. Reifler,* 446 F.3d 65, 96 (2d Cir. 2006)). In *Figueroa-Cartagena*, the defendant became involved in a carjacking venture after the car had already been taken from the victim. Nonetheless, this Court found her to be an aider an abettor because she "lent significant aid to [her cohorts]: she allowed them to hold [the victim] at her parents' house, she helped recruit her brother as a guard, and she warded off curious neighbors." *Figueroa-Cartagena*, 612 F.3d at 75. This Court found that she, like the appellants here, "was not 'merely present' at the scene of the crime; her aid was essential to the success of the scheme, and she may therefore be held liable as an aider and abettor." *Id.* (quoting *United States v. Peña–Lora,* 225 F.3d 17, 28–29 (1st Cir. 2000) (affirming conviction where defendant aided and abetted hostage-taking by bringing meals to the hostage and letting him out to use the restroom); Wayne R. LaFave, *Substantive Criminal Law* § 13.2 (2d ed. 2003)).

To boot, Carmen's testimony that the hostage-takers "were incredibly organized," (DE 670 at 5), "assaulted [her] sons during the whole time," (DE 670 at 8), and "were moving throughout the house the whole time," (DE 669 at 26, "in and out of the living room," (DE 670 at 24), further establishes that they acted to aid and abet the carjacking. It proves that the assailants acted in synchronized concert and undertook continuous and coordinated actions to ensure achieving the crew's goals, which included the taking of the Frontier to go get money from an ATM machine.

Therefore, the appellants' arguments that they did not act to help the carjacking succeed hold no water. Their extensive participation provided substantial assistance.

*C. Intent of the Aiders*

Finally, Rivera, Hernández, and Ríos take aim at their convictions by arguing that they lacked the requisite intent to aid and abet the carjacking. Their contentions that they lacked advance knowledge of the carjacking before arriving at the house and while at the house are without merit.[15]

_____

[15] As an initial matter, Rivera, Hernández, and Ríos only preserved this specific "advance knowledge" argument below. They have waived all other arguments to their intent by failing to press them under the miscarriage of

"To satisfy the aiding and abetting liability scienter element, such participation required advance knowledge of the elements that constitute the charged offense." *Encarnación–Ruiz,* 787 F.3d at 584; *see also Ford,* 821 F.3d at 69. But, contrary to the appellants' protests, this does not mean that they must have known that a carjacking was on the books before arriving at the house. Rather, advance knowledge "means knowledge at a time the accomplice can do something with it—most notably, opt to walk away." *Rosemond v. United States*, 572 U.S. 65, 78 (2014). That standard is met here. [16]

As established above, Rivera, Hernández, and Ríos participated in deciding to carjack the Frontier and participated in taking Luis Emilio from the living room before Suárez and Guzmán drove off in the vehicle. [17] Again, Carmen testified at trial that "[t]hey took [Luis Emilio]" from the living

---

justice standard. For example, they do not challenge that they had the required advance knowledge after Suarez and Guzman left for the ATM in the Frontier and they continued to hold the family hostage to aid that endeavor. And besides, they do not meaningfully develop any.

[16] Their advance knowledge is irrelevant if the Court agrees with the United States' argument above that the appellants are responsible for the carjacking as principals. *See*, *supra*, p. 34-36.

[17] This, along with other record proof, belies the appellants' baseless claims that they did not know of the carjacking or were not there when it occurred.

room, down to the first floor. (DE 669 at 28). Antonio also testified that the assailants took Luis Emilio to the first floor because "they wanted to take him … so that he could take money out from several ATMs." (DE 670 at 51). Suárez also testified, talking of his cohorts, that "[t]hey wanted to put him in one of the vehicles … from the house" (DE 652 at 50), because "they wanted to kidnap him and bring him to the closest ATM machine." (DE 652 at 54). This, at the very least, provided the jury with sufficient proof that Rivera, Hernández and Ríos possessed the required "advance knowledge of the elements that constitute the charged offense." *Encarnación–Ruiz*, 787 F.3d at 584. Especially given that Carmen testified that the home invaders "were incredibly organized." (DE 670 at 5)

Even omitting the aforesaid, "when the criminal conduct extends over a period of time, a latecomer 'may be convicted of aiding and abetting even if [they] did not learn of the crime at its inception but knowingly assisted at a later stage.'" *Figueroa-Cartagena*, 612 F.3d at 75 (quoting *Reifler*, 446 F.3d at 96). Here, as argued above, the carjacking offense continued even after Guzmán and Suárez drove off in the Frontier. So, a reasonable jury could conclude that when Rivera, Hernández, and Ríos continued to hold the victims in the house hostage while Guzmán and Suárez went to the ATM

machine, communicated with Guzmán to provide the ATM pin number, and bound Carmen before leaving, they already met the necessary scienter too. This, because "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Rosemond*, 572 U.S. at 77. Again, advance knowledge "means knowledge at a time the accomplice can do something with it—most notably, opt to walk away." *Id.* at 78.

Rather than walk away, Rivera, Hernández, and Ríos continued to perform acts intended to aid their cohorts in the commission of the ongoing carjacking and robbery at the ATM machine. And by the time the assailants took the Frontier, they had already exhausted their attempts to get assets in the house from the victims and had thoroughly ransacked and searched the place. A reasonable jury could thus only infer that Rivera, Hernández, and Ríos stayed behind to ensure that the cash-seeking expedition in the stolen Frontier was successful. Indeed, there was no other purpose to be served by their continued presence and actions at the house.

The appellants also try to distance themselves from the carjacking by raising different variations of an argument that the carjacking was not part of the scheme or plan. But the plan was never as narrow as they make it out

to be. The evidence introduced at trial established that they planned to take money and valuables from the house. (DE 562 at 15-18, 50-62). "Whatever they could steal, they took," Carmen testified. (DE 670 at 6). This included, among other things, a revolver, wallets, checkbooks, money, electronic devices, laptops, cell phones, jewelry, ATM cards and the Frontier pick-up truck that was parked at the entrance. (DE 652 at 77; DE 669 at 27; DE 670 at 6, 9, 52; DE 678 at 13-15). In that context, taking the truck was either a necessary step to accomplishing their goals of obtaining money or the seizing of a valuable thing. Under both outlooks, the carjacking was part and parcel of their scheme from the outset. To boot, the vicious attacks and frantic search for goods to steal implies that the scheme was always characterized as an "anything goes" proposition. The readily apparent broadness of their scheme, and their evident willingness to do whatever it took to secure money and valuables, blunts the edges of their contentions.

Ríos fares even worse than Rivera and Hernández[18] in all of this because of testimony he confessed to watching Guzmán and Suárez leave in

---

[18] Hernández's contentions that he was misidentified at trial are without merit: Two separate witnesses identified him at trial. That was enough for a rational jury to conclude beyond a reasonable doubt that he was one of the

the Frontier, to knowing they were headed to withdraw cash from an ATM, and about Guzmán calling to obtain the ATM card pin number. Yet, he remained in the already ransacked house acting in concert with his cohorts to ensure the carjacking scheme succeeded. This provided a further basis for a rational jury to conclude beyond a reasonable doubt that he possessed the requisite advance knowledge.

This Court should reject all attacks on the sufficiency of the evidence. Accordingly, the district court did not err by denying the appellants' motions for acquittal.

### D. The Firearm Count

Because, as detailed above, a rational jury could find Rivera, Hernández, and Ríos guilty beyond a reasonable doubt of the carjacking

---

participants of the home invasion and robbery. To boot, "[i]dentification evidence is for the jury in all but 'extraordinary cases.'" *United States v. De Leon-Quinones*, 588 F.3d 748, 753 (1st Cir. 2009) (quoting *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003)). And a sufficiency-of-the-evidence claim is not the proper vehicle to challenge a purported unreliable identification. *See generally id*. Regardless, like his co-appellants, he puts all his sufficiency evidence arguments in a single basket—the purported commission of a state robbery offense, not a carjacking—a claim wholly separate from a misidentification theory of defense.

count, there is no reason (and the appellants don't provide one) to reverse

their convictions as to the firearm count.

## II. The district court did not abuse its discretion by denying Rivera's *Brady* claims.

**Issue**

Rivera argues that the district court erred by not dismissing the indictment due to the United States' disclosure in May 2022 of exculpatory and potentially exculpatory evidence. (Riv. AB at 23-26). He posits, via conclusory statements, that the lengthy continuance issued by the district court was not enough to prevent prejudicing his defense. (Riv. AB at 26-27).

**Standard of Review**

"Methods of enforcing disclosure requirements in criminal trials are generally left to the discretion of the trial court, and [this Court] review[s] *Brady* determinations for abuse of discretion." *United States v. Celestin*, 612 F.3d 14, 22 (1st Cir. 2010) (quoting *United States v. DeCologero*, 530 F.3d 36, 54-55 (1st Cir. 2008); *see also United States v. Orlandella*, 96 F.4th 71, 94 (1st Cir. 2024); *United States v. Raymundí-Hernández*, 984 F.3d 127, 159 (1st Cir. 2020).

**Discussion**

The district court did not abuse its discretion in rejecting Rivera's *Brady* claims. He could not establish a *Brady* violation because he had ample time

with the evidence before trial and he did not (and could not) establish that he had been prejudiced by the late disclosures.[19]

United States v. Brady requires that the United States disclose "evidence favorable to an accused" that is "material either to guilt or to punishment." 373 U.S. 83, 87 (1963). A Brady violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." Orlandella, 96 F.4th at 97 (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Rivera cannot establish a Brady violation because he failed to establish that he was prejudiced by the May 2022 late disclosures,[20] both below and on appeal.

---

[19] Rivera's opening brief complains that the district court "did not sanction nor dismissed [sic] the Indictment." (Riv. AB at 13). His framing of sanctions as an appropriate remedy signals an acknowledgement of no prejudice.

[20] While Rivera's brief accuses the United States of "non-disclosure," (Riv. AB at 23), all pertinent evidence was provided to him by the end of May 2022, per his own admissions below. (DE 579 at 2-3). Thus, only late disclosure is at issue here. In any event, Rivera does not develop an argument as to non-disclosure, thereby waiving it. Zannino, 895 F.2d at 17.

To be sure, "even a grossly belated disclosure does not violate *Brady* unless the defendant suffers prejudice from the delay." *United States v. Mason*, 951 F.3d 567, 573 (D.C. Cir. 2020). Thus, Rivera must show "that the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case." *United States v. Cruz-Feliciano*, 786 F.3d 78, 87 (1st Cir. 2015) (quoting *United States v. Van Anh,* 523 F.3d 43, 51 (1st Cir.2008)); *see also United States v. Avilés-Colón*, 536 F.3d 1, 25 (1st Cir. 2008) (quoting *United States v. Misla-Aldarondo*, 478 F.3d 52, 63 (1st Cir. 2007)). Rivera "must at a minimum make a 'prima facie' showing of a plausible strategic option which the delay foreclosed." *Cruz-Feliciano*, 786 F.3d at 87 (quoting *Van Anh,* 523 F.3d at 51).

But, as the United States pointed out in its opposition to Rivera's *Brady* motions below, Rivera failed to make any showing of prejudice, let alone a prima facie showing of a foreclosed strategic option. (DE 587 at 2-8). And the district court denied Rivera's motion to dismiss, noting it was "persuaded by the substance of the government's analysis." (DE 613 at 1).

On appeal, Rivera does not address this shortcoming, excuse this waiver or contend with the district court's rationale for rejecting his *Brady* claims. This is waiver. *See Balser*, 70 F.4th at 617; *Echevarría v. AstraZeneca*

*Pharmaceutical LP*, 856 F.3d 119, 139 (1st Cir. 2017) (quoting *Zannino*, 895 F.2d at 17); *United States v. Mala*, 7 F.3d 1058, 1061 (1st Cir. 1993) ("The devoir of persuasion rests with the appellant to show error in the ruling below."); *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."). Even if he tried to undo his waiver on appeal, arguments waived below cannot make their debut in an appellate brief. *See Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021) (quoting *Thomas v. Rhode Island*, 542 F.3d 944, 949 (1st Cir. 2008) ("appellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court" (cleaned up))); *see also Dimott v. United States*, 881 F.3d 232, 244 (1st Cir. 2018) (Torruella, J., joining in part and dissenting in part) ("This Court religiously finds a party's failure to raise an argument before the district court as waived on appeal."). Even if not waived, a district court "obviously" does not abuse its discretion in denying a motion based on deficiencies in a defendant's satisfaction of a required showing. *Cf. United States v. Font-Ramirez*, 944 F.2d 42, 46 (1st Cir. 1991).

To boot, on appeal, Rivera only contends that had "the recording of the interviews, the fingerprint analysis reports, and the DNA forensics

documents been timely disclosed, Rivera would have been able to prepare a more adequate defense." (Riv. AB at 26). He further posits that the "untimely disclosure … impaired Rivera's ability to investigate matters further, interview additional witnesses, obtain record and documents in his favor, and even move to sever, or to suppress or eliminate the evidence." (Riv. AB at 26).[21] However, these conclusory, speculative, and generic assertions are not enough to meet his burden of establishing prejudice. *See United States v. Chesser*, 795 F. App'x 242, 245 (5th Cir. 2019) (deeming similar arguments "too speculative to support finding an abuse of discretion"). And they certainly are not enough to "make a 'prima facie' showing of a plausible strategic option which the delay foreclosed." *Cruz-Feliciano*, 786 F.3d at 87 (quoting *Van Anh,* 523 F.3d at 51). There is no inkling of a plausible but foreclosed strategy. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17.

Rivera's failure to establish prejudice is unsurprising given the travel of the case. To be sure, Rivera received the DNA and fingerprint reports and some recorded interviews on May 18; more recorded interviews on May 23; and transcripts, translations, and reports as to the recorded interviews on

---

[21] Rivera does not even cite to case law in making his arguments. This dooms his claim. *Zannino*, 895 F.2d at 17.

May 31. Therefore, by the time trial commenced on June 27, Rivera had had the evidence at his disposal for between 35 and 27 days, depending on the evidentiary material. This was ample time to investigate the evidence and put it to full use. *See Cruz-Feliciano*, 786 F.3d at 88 (citing *United States v. Peters,* 732 F.2d 1004, 1009 (1st Cir.1984)) (finding that the defendant had sufficient time to "make effective use of the disclosed material"); *United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir. 1977) (holding that the defendant failed to establish that the United States committed a *Brady* violation in part because defense counsel had "eight full days prior to trial" to interview a government informant); *United States v. Douglas*, 525 F.3d 225, 245-46 (2d Cir. 2008); *United States v. Navarro*, 263 F. App'x 428, 429 (5th Cir. 2008) (per curiam); *United States v. Long*, 870 F.3d 741, 748 (8th Cir. 2017); *United States v. Lawson*, 368 F. App'x. 1, 4-5 (11th Cir. 2010). So, Rivera's extensive opportunity to study and make use of the discovery materials cuts against any argument of prejudice.[22]

---

[22] At no point below did Rivera ask the court for further time to prepare and make use of the discovery materials. Instead, he seized the opportunity to use the disclosures as a shield against conviction and a sword against the United States by demanding dismissal of the indictment with prejudice and sanctions against the prosecution. And at trial, he did not tell the court that his defense strategy had been hampered by the late disclosure.

Furthermore, Rivera and his co-defendants effectively utilized the evidence at trial. The disclosure of this evidence did not prevent defense counsel from effectively using it at trial. *See Cruz-Feliciano*, 786 F.3d at 88 (finding no prejudice when "late disclosure of [the] evidence did not prevent defense counsel from effectively using it at trial"). For example, they used Suárez's recorded interview to cross-examine him at length and introduced extensive testimony as to the DNA and fingerprint reports, as well as the reports themselves, while presenting their case in chief. (DE 652 at 62-133; DE 659; DE 684; DE 704; DE 724).[23] And there was really not much to gain from that evidence, given testimony that the robbers wore gloves throughout the ordeal, and there was no evidence introduced that they secreted fluids or otherwise left sources of DNA. (DE 562 at 50-62; DE 589 at 154).

While they did not use López's recorded interview or Ríos's second recorded interview, Rivera has not established that any decision not to do so was due to the belated disclosures (rather than because they were unable or

---

[23] The United States maintained below that the May 18, 2022 discovery package was largely a redisclosure of previously produced evidence, out of an abundance of caution. (DE 546 at 3; DE 589 at 154.).

unwilling to testify and the interviews were not admissible otherwise).[24] To be sure, Rivera does not even suggest that López and Ríos would have waived their rights against self-incrimination and testified on his behalf.[25]

Rivera's already-dull prejudice showing is further diminished by the weakness of his misidentification theory, which was rebutted by Carmen's identification of him as the assailant that, unmasked, took her from the garden and into the house by force. (DE 669 at 52-53; *see also* DE 562 at 15-16).

The district court accordingly did not abuse its discretion in denying Rivera's *Brady* motion.

---

[24] The district court denied severance from Ríos's trial and suppressed his second interview on his motion.

[25] Rivera did not pursue an alibi defense either.

### III. The district court did not abuse its discretion by denying severance of Rivera's trial.

## Issue

Rivera argues that the district court erred by not severing his trial from that of Ríos. (Riv. AB at 15-21). He posits that the joint trial prevented him from using exculpatory statements made by Ríos in his favor. (Riv. AB at 18-19). And he contends evidence of Ríos's admissions to law enforcement had an improper spill-over effect that prejudiced him. (Riv. AB at 19-20).

## Standard of Review

This Court reviews a denial of severance for "manifest abuse of discretion." *United States v. Ponzo*, 853 F.3d 558, 568 (1st Cir. 2017); *see also United States v. Tiem Trinh*, 665 F.3d 1, 17 (1st Cir. 2011) (citations omitted) (requiring a "manifest abuse of discretion which deprived appellant of a fair trial and resulted in a miscarriage of justice"). "The hurdle is intentionally high…" *United States v. Pena-Lora*, 225 F.3d 17, 33 (1st Cir. 2000) (citation omitted).

## Discussion

The district court did not manifestly abuse its discretion by denying severance of Rivera's trial.

Joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Thus, "[a]s a rule, persons who are indicted together should be tried together." *United States v. Flores-Rivera*, 56 F.3d 319, 325 (1st Cir. 1995) (citing to *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993)).

Still, "[i]f the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant . . ., the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Prejudice from joinder can come in various forms. *United States v. Innamorati*, 996 F.2d 456, 469 (1st Cir. 1993). And defendants are not entitled to severance merely because it would improve their chances of acquittal; co-defendants are usually tried together absent a strong showing of prejudice. *See United States v. Rodriguez-Marrero*, 390 F.3d 1, 26 (1st Cir. 2004). A district court should grant a severance "only if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Rivera contends that the district court compromised a specific trial right when it denied his motion for severance because he was prevented from eliciting exculpatory statements from Ríos. This Court has set forth a clear test to evaluate whether to sever a case based on such a claim:

> In deciding the motion for severance based on the alleged need for the testimony of a co-defendant, district courts are to employ the two-tiered analysis set forth in *United States v. Drougas*, 748 F.2d 8, 19 (1st Cir. 1984). To meet the first tier of that test, a defendant must demonstrate: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed." *United States v. Smith*, 46 F.3d 1223, 1231 (1st Cir. 1995). If the defendant can make that showing, the court should move on to the second tier of the *Drougas* analysis and "(1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion." *Smith*, 46 F.3d at 1231.

*United States v. Catalan-Roman*, 585 F.3d 453, 461 (1st Cir. 2009); *see also United States v. Nason*, 9 F.3d 155, 159 (1st Cir. 1993) (applying analysis and requiring proof that a co-defendant would testify). But, as the United States

pointed out in its opposition to Rivera's severance motion below, Rivera failed to establish that Ríos would in fact testify if the cases were severed and did not raise any argument as to the second tier of the *Drougas* analysis. (DE 622). And the district court denied Rivera's motion because it agreed. (DE 625).

On appeal, Rivera does not address these shortcomings, excuse these waivers or contend with the district court's rationale for denying his motion. This is waiver. *See Balser*, 70 F.4th at 617; *Echevarría*, 856 F.3d at 139 (quoting *Zannino*, 895 F.2d at 17); *Mala*, 7 F.3d at 1061 ("The devoir of persuasion rests with the appellant to show error in the ruling below."); *Nixon*, 784 F.3d at 1366 ("The first task of an appellant is to explain to us why the district court's decision was wrong."). Even if he tried to undo his waiver on appeal, arguments waived below cannot make their debut in an appellate brief. *See Carrozza*, 992 F.3d at 59 (quoting *Thomas*, 542 F.3d at 949 ("appellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court" (cleaned up))); *see also Dimott*, 881 F.3d at 244 ("This Court religiously finds a party's failure to raise an argument before the district court as waived on appeal.").

To boot, the argument he advances now is damningly just as flawed as his motion below because he, again, ignores the bulk of the *Drougas* analysis. He does not establish that Ríos would have testified on his behalf had a severance been granted and he foregoes developing arguments as to most of its prongs. He therefore waives his claim once more. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17. Even if not waived, a district court "obviously" does not abuse its discretion in denying a motion to sever based on *Drougas* deficiencies in a defendant's arguments. *Font-Ramirez*, 944 F.2d at 46 (1st Cir. 1991).

Rivera next complains that "[t]hroughout the trial, more evidence was presented against Ríos than against Rivera; beginning with Ríos'[s] initial admissions to Agent Gonzalez," and that prejudiced him. (Riv. AB at 19). But, besides concluding that the evidence against Ríos prejudiced him, Rivera does not develop this claim and thereby waives it.

His failure to develop his argument is particularly damning given that "to prevail on appeal in a challenge to a denial of a Rule 14 motion, the burden is on the defendant not only to establish prejudice but 'to make a *strong* showing' of the same." *United States v. Martinez*, 994 F.3d 1, 12 (1st Cir.

2021) (emphasis in original) (quoting *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir. 1990)). Rivera does not meet that exacting standard.

And he could not. Contrary to his assertions, the evidence presented against Rivera was substantial. And he does not point to any evidence aside from Ríos's statements to law enforcement as prejudicing him. Indeed, Rivera points to Ríos's admissions about how the victims were tortured. But he does not explain how introduction of Ríos's admissions was not cumulative to the testimony from Suárez, and of most impact, the victims themselves. And Rivera does not and cannot argue that this testimony was inadmissible. After all, all evidence is meant to be prejudicial, it is only *unfair* prejudice that the rules guard against.

Moreover, the only thing non-cumulative that Ríos's statements brought to the table was an admission that he was there. And the straightforward and brief content of the admissions was not confusing and the jury could ably distinguish that Ríos's admissions, which did not reference Rivera, did not color Rivera's guilt. This case stands in stark contrast with *Martinez*: there the evidence as to the other defendants and counts was voluminous, spanning "days of detailed evidence," 994 F.3d at 14, and "the prosecution's presentation of its case repeatedly blurred the

lines between the schemes." *Id*. at 15. Thus, this Court found *Martinez* was "the rare case in which '[t]he dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, [were] so great' as to require severance." *Martinez*, 994 F.3d at 16 (quoting *Kotteakos v. United States*, 328 U.S. 750, 774 (1946)). Here, the limited and straightforward evidence presented against Ríos did not implicate more than, at most, "the garden variety prejudice" to Rivera that is "always" present "in any trial where more than one offense or offender are tried together." *Boylan*, 898 F.2d at 246 (cleaned up).

Moreover, the potential for spillover prejudice was greatly minimized in this case by the court's instructions. *See United States v. Zimny*, 873 F.3d 38, 59 (1st Cir. 2017). The court twice advised the jury that testimony of Ríos's interview with law enforcement could "only be considered with respect to [Ríos], not with respect to [Rivera] or [Hernández]." (DE 669 at 42). Then, when imparting its instructions after the close evidence, the district court again told the jury to not consider Ríos's statement "against any defendant other the [Ríos] himself." (DE 871 at 9). The district court also told the jury it "must give separate consideration to the evidence as to each count and as to each defendant." (DE 871 at 12). "The fact that you may find a defendant

guilty or not guilty on one count should not control your verdict as to the other defendants on that count or as to that and the other defendants in the other count," the court told the jury. (DE 871 at 12). Then, the district court went through all the charges against each defendant individually and instructed the jury that findings of guilt required that the United States prove each element as to each individual defendant beyond a reasonable doubt. (DE 871 at 12-28). The district court thus provided lengthy, repeated, individualized, and detailed instructions that nullified any potential prejudice. And because the jury is presumed to follow the court's instructions, *see Zimny*, 873 F.3d at 60, Rivera's claim must fail. Plus, Rivera presents only conclusory arguments that the instructions were insufficient, thereby waiving his claim.

The district court accordingly did not abuse its ample discretion in denying Rivera's motion to sever.

**IV. Rivera waives his challenge to the admission of eight statements on Confrontation Clause grounds by failing to develop his argument. He also waives his claims as to five of those statements because he did not lodge an objection below and failed to argue plain error. The remaining statements are either unaffected by the Confrontation Clause or harmless.**

## Issue

Rivera argues that the district court erred by admitting hearsay statements in violation of his constitutional confrontation rights. (Riv. AB at 27-31). Though he also maintains that the statements constituted inadmissible hearsay, he only does so as part of his confrontation rights argument, and he explicitly cabins his claim of error to a confrontation rights violation. (Riv. AB at 27, 27-31, 31).

## Standard of Review

This Court reviews preserved confrontation claims de novo. *See United States v. Perez-Vasquez*, 6 F.4th 180, 197 (1st Cir. 2021) (citing *United States v. Veloz*, 948 F.3d 418, 430 (1st Cir. 2020)). However, in the absence of a contemporaneous objection, review is for plain error. *See United States v. Acevedo-Maldonado*, 696 F.3d 150, 156 (1st Cir. 2012) (citations omitted).

## Discussion

Rivera's confrontation rights claim fails for various reasons: he does not properly develop his argument and relies on incorrect and superseded caselaw, he fails to argue plain error for four of the statements he challenges despite never objecting to their admission below and for one he objected to on other grounds, most of the "statements" are not statements entered for their truth or are not testimonial, and the introduction of the remaining statements was harmless beyond a reasonable doubt.

In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53-54 (2004). The Court's opinion "limited the Confrontation Clause's reach to testimonial statements." *Michigan v. Bryant*, 562 U.S. 344, 354 (2011). Thus, the "threshold question" in evaluating a Confrontation Clause claim "is whether the challenged statement is testimonial." *Figueroa-Cartagena*, 612 F.3d at 85. "If it is not, the Confrontation Clause 'has no application.'" *Id.* (quoting *Whorton v. Bockting*, 549 U.S. 406, 420 (2007)). Even testimonial statements introduced "for purposes other than

establishing the truth of the matter asserted" are unaffected by the Confrontation Clause. *Crawford*, 541 U.S. at 59 n.9.

### A. Rivera fails to develop his argument and relies on unavailing caselaw

Rivera fails to properly develop his argument. He does not argue that the alleged statements in question are testimonial, and therefore leaves that crucial "threshold question" unaddressed and waives any argument to that effect. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17. Any passing mention is insufficient, as "arguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal." *United States v. Sevilla-Oyola*, 770 F.3d 1, 13 (1st Cir. 2014) (quoting *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir.2011); *Zannino*, 895 F.2d at 17). "Judges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority." *Rodriguez*, 659 F.3d at 175. Rivera has failed to do so here.

That the alleged statements were testimonial is not a foregone conclusion. The Court in *Crawford* "observed that the answer to [the question of whether a statement is testimonial] would depend heavily on the nature and context of a given statement." *United States v. Brito*, 427 F.3d 53, 59 (1st

Cir. 2005) (citing *Crawford*, 541 U.S. at 51). "Courts must evaluate challenged

statements in context, and part of that context is the questioner's identity."

*Ohio v. Clark*, 576 U.S. 237, 249 (2015) (citing *Bryant*, 562 U.S. at 358). The ones

at issue here were made by Luis Emilio to his family members outside of an

investigatory setting. The contextual clues available cut against deeming

them testimonial. *See Davis v. Washington*, 547 U.S. 813, 825 (2006) (citing

*Dutton v. Evans*, 400 U.S. 74, 87-89 (1970) a case involving statements from

one prisoner to another, as involving nontestimonial statements); *Giles v.*

*California*, 554 U.S. 353, 376 (2008) (indicating that "[s]tatements to friends

and neighbors about abuse and intimidation" would be nontestimonial);

*United States v. Pelletier*, 666 F.3d 1, 9-10 (1st Cir. 2011) (holding that informal

"statements made by one inmate to another ... are not testimonial"); *United*

*States v. Castro-Davis*, 612 F.3d 53, 65 (1st Cir. 2010) (holding that statements

made during a "conversation with a close family member without any

intention of assisting in [the declarant's] own prosecution" were not

testimonial).

His claim is further doomed because the caselaw he does rely on is

incorrect and out of date. He maintains that the "right to confrontation

governs non-testimonial hearsay statements as well as testimonial hearsay

statements." (Riv. AB at 28 (citing *Crawford*, 541 U.S. at 53)). But that assertion is plainly wrong. *See Bryant*, 562 U.S. at 354 (stating that *Crawford* "limited the Confrontation Clause's reach to testimonial statements"). He then signals that he concedes the statements in question are non-testimonial by arguing that when "dealing with non-testimonial hearsay statements, the *Roberts* holding and standard apply, instead of the *Crawford* rule." (Riv. AB at 28 (citing *Ohio v. Roberts*, 448 U.S. 56, 66 (1980))). However, again, the Supreme Court rejected *Roberts*'s reliability-based approach to the Confrontation Clause when instituting the *Crawford* rule. *See Hemphill v. New York*, 595 U.S. 140, 150 (2022) (citing *Crawford*, 541 U.S. at 61). Rivera presses on with his defunct reliability angle, citing *United States v. Franklin*, 51 F.4th 391, 396-97 (1st Cir. 2022), a case that deals with the reliability of hearsay evidence in the context of revocation hearings and that has no bearing on his Confrontation Clause claims. And he wastes ink concluding, without more, that the alleged statements are unreliable inadmissible hearsay. *Zannino*, 895 F.2d at 17.

Rivera therefore fails to argue the correct framework and "analyz[e] on-point authority." *Rodriguez*, 659 F.3d at 175. This is fatal to his

Confrontation Clause claims. *See Mala*, 7 F.3d at 1061 ("The devoir of persuasion rests with the appellant to show error in the ruling below.").

### B. *Rivera waives most of his challenges by ignoring plain error review*

Rivera did not object at all to four of the testimony portions he now complains violated his confrontation rights. In one instance, Carmen testified that Luis Emilio told their assailants that his grandparents had owned a dairy farm at one point, but that the family no longer had money – but Rivera did not object. (DE 669 at 27). In another, she said that Luis Emilio had "told [her] a little about" what happened when they took him downstairs and recounted what he said – but Rivera again failed to object. (DE 669 at 28). Antonio told the jury, without objection, that Carmen and Luis Emilio explained to their assailants that some checks the had found were "from many years ago; that that dairy farm was in ruins; that [they] didn't have any money; to please believe them." (DE 670 at 41). Rivera did not object. (DE 670 at 41). Antonio also testified, without objection, about Carmen and Luis Emilio telling the assailants that they could take their ATM cards and go withdraw money at a machine. (DE 670 at 51). Due to Rivera's

failure to object to the admission of these statements, plain error review applies. *See Acevedo-Maldonado*, 696 F.3d at 156 (citations omitted).

Rivera also failed to preserve a *Crawford* claim as to another portion of Carmen's testimony in which she, looking at a picture of the first floor, identified a chair as the one in which the assailants had Luis Emilio sitting. (DE 669 at 39). As to that testimony, Rivera objected, but only "as to hearsay and lack of personal knowledge." (DE 669 at 39). However, "[i]t is well settled that "an objection to the admission of evidence on one ground does not preserve other grounds for appeal." *United States v. Concepcion-Guliam*, 62 F.4th 26, 32 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 171, 217 L. Ed. 2d 67 (2023) (quoting *United States v. Iwuala*, 789 F.3d 1, 7 (1st Cir. 2015). Therefore, because Rivera did not object on Confrontation Clause grounds, review of this statement is also for plain error. *See Concepcion-Guliam*, 62 F.4th at 32.

But Rivera does not argue the plain error standard in his opening brief. To succeed under plain error review, he must demonstrate that: (1) there was an error that (2) was plain, (3) affected his substantial rights, and (4) adversely impacted the fairness, integrity, or public reputation of her judicial proceedings. *United States v. Romero*, 906 F.3d 196, 205 (1st Cir. 2018). Argumentation as to any of the four required showings is absent from

Rivera's brief. Rivera does not address the plain error standard at all, and thereby waives his claims. *See United States v. Abbas*, -- F.4th --, 2024 WL 1853052, at *18 (1st Cir. Apr. 29, 2024) (citing *United States v. Colón-De Jesús*, 85 F.4th 15, 25 (1st Cir. 2023)). Even failing to attempt to satisfy all four prongs of the plain error standard constitutes waiver on appeal. *United States v. Rodriguez-Monserrate*, 22 F.4th 35, 40 (1st Cir. 2021) (citing *United States v. Pabon*, 819 F.3d 26, 33-34 (1st Cir. 2016)). *See also United States v. Bramley*, 847 F.3d 1, 5 (1st Cir. 2017) ("The proponent of plain error must carry the devoir of persuasion as to each of the four elements that collectively comprise the plain error standard.").

C. *Even if not waived, the abovesaid statements are not subject to the Confrontation Clause*

If more were needed, Carmen and Antonio's testimonies regarding Luis Emilio's statements to the assailants about the dairy farm and them no longer having money were not introduced for the truth of the matter asserted. Neither was Antonio's testimony about Carmen and Luis Emilio telling the assailants to go withdraw money from an ATM. They were instead introduced for their effect on the listeners (the assailants). *See United States v. Colon-Diaz*, 521 F.3d 29, 34 (1st Cir. 2008) (citing *United States v.*

*Bailey,* 270 F.3d 83, 87 (1st Cir. 2001) ("directions from one individual to another … do not constitute hearsay," and nonhearsay includes statements "'offered to … supply a motive for the listener's action'" (citing *United States v. Murphy,* 193 F.3d 1, 6 n. 2 (1st Cir. 1999)))); *see also United States v. Bellomo,* 176 F.3d 580, 586-87 (2d Cir. 1999) (statement that person was killed because he was dealing drugs not for the truth of the matter asserted but rather offered for listener's state of mind, not reason for murder); *United States v. Darby,* 744 F.2d 1508, 1524 (11th Cir. 1984), (statement they knew where witness's brother was offered for effect on listener); *United States v. Lambinus,* 747 F.2d 592 (10th Cir. 1984) (statements introduced for effect on listener). And they are not testimonial because they were made by Luis Emilio, in front of Carmen and Antonio, to his assailants in an attempt to appease them, plead for not being harmed and urge them to leave the house. *See Crawford,* 541 U.S. at 53; *Bryant,* 562 U.S. at 354

And Carmen's identification of the chair where Luis Emilio was sat was not an out-of-court statement by Luis Emilio at all, but rather merely an identification made using her own personal knowledge. (DE 669 at 30-31; DE 670 at 12-13). The remaining unpreserved admitted statement, even if not waived, is harmless as will be explained below.

*D. The other challenged statements are either not subject to the Confrontation Clause or are harmless*

That leaves three preserved challenges. The first one fails for the same reasons as Carmen's chair identification: Antonio, looking at pictures, identified an injury to Luis Emilio's face as resulting from being punched and a wound on his left leg as resulting from being stabbed. (DE 670 at 48). However, these were merely identifications of injuries Antonio saw Luis Emilio had sustained rather than out-of-court testimonial statements provided for the truth of the matter asserted. (DE 670 at 35, 36, 43).

The other two preserved objections pertained to testimony that Luis Emilio saw from his room that the assailants grabbed Carmen and Antonio outside the house and that they were armed, (DE 669 at 19); and testimony that Luis Emilio told Carmen that, while on the first floor, he had asked the assailants "to give him a shirt or something so he could tie off the wound" and that they had refused and left him bleeding out, (DE 669 at 30). Even if testimonial, admission of these statements was harmless beyond a reasonable doubt.

"Even if evidence is admitted in error, [this Court] may affirm a judgment of conviction where the government has met 'its burden of

showing that any such error was harmless beyond a reasonable doubt.'" *United States v. Cabrera-Rivera*, 583 F.3d 26, 36 (1st Cir. 2009) (quoting *United States v. Earle*, 488 F.3d 537, 545 (1st Cir.2007)). The Court looks to "a number of factors" to consider harmlessness, "including whether the challenged statements were central to the prosecution's case; whether the statements were merely cumulative of other (properly admitted) evidence; the strength of corroborating or contradicting evidence; the extent to which cross-examination was permitted; and the overall strength of the case." *Id.* (citing *Earle*, 488 F.3d at 546).

Carmen's testimony that Luis Emilio saw her and Antonio being grabbed outside of the house by armed men is cumulative, both Carmen and Antonio themselves testified as to their personal experience being grabbed by the gunmen and rushed into the house. (DE 669 at 18-20; DE 670 at 32-33). Suárez did as well. (DE 562 at 46-48). Other evidence of them being armed was supplied too. (DE 562 at 41, 47, 70; DE 669 at 18, 20; DE 670 at 33, 34). Luis Emilio's perception of the abduction of his mother and brother from the garden was not central to the United States' case and simply

repeated that of those involved.[26] *See, supra,* Issue I. And, removing that statement, the strength of the United States case remained robust, if not identical. *Id.*[27]

The statements regarding Luis Emilio asking for a shirt and being refused are probative only to the assailants' callousness and the disregard for their victims' wellbeing they displayed. But they displayed the same callousness, disregard and refusal to help throughout the entire home invasion by, for example, pouring hot oil on Luis Emilio and Antonio, stabbing them, and constantly hitting them, as other evidence established. (DE 562 at 49; DE 669 at 20, 21, 24, 25-26; DE 670 at 8, 25, 33, 34, 35, 36, 41, 42-43, 47). The statement was also cumulative insofar it established that Luis Emilio was bleeding out. Carmen testified in other unchallenged instances as to Luis Emilio bleeding out, him asking her for help because he was bleeding out, to seeing Luis Emilio's blood "everywhere" and as to rushing

---

[26] The United States did not use this statement or refer to it at closing arguments. (DE 725). It did not use or refer to the one discussed below either. (DE 725).

[27] Rivera's unpreserved challenge to Carmen's other testimony of Luis Emilio's statements, (DE 669 at 28), would fail for similar reasons if not waived.

to the hospital while he was bleeding out. (DE 669 at 30-31; 670 at 12-13). The statement was not central to the United States, nor would its absence undermine the strength of the overall case. *See, supra,* Issue I.

Admission of these statements was harmless beyond a reasonable doubt. For all the above, Rivera's Confrontation Clause claims should fail.

## V. The district court gave Rivera and Hernández reasonable sentences.

**Issue**

Rivera argues that the district court imposed a procedurally unreasonable sentence because it erroneously calculated his criminal history category and applied serious bodily injury and abduction enhancements. (Riv. AB at 41-46). Hernández maintains that the district court imposed a procedurally and substantively unreasonable sentence because it mis-weighed the sentencing factors and disregarded mitigating ones in fashioning an "upwardly variant" sentence. (Her. AB at 48-51).

**Standard of Review**

This Court reviews preserved procedural sentencing challenges for abuse of discretion. *United States v. Viloria-Sepúlveda*, 921 F.3d 5, 8 (1st Cir. 2019). Within that framework, this Court reviews "a district court's factual findings for clear error, and its interpretation and application of the Guidelines de novo." *United States v. Vélez-Soto*, 804 F.3d 75, 77 (1st Cir. 2015). When a defendant challenges the factual basis for the district court's application of a sentencing enhancement, this Court asks "only whether the court clearly erred in finding that the government proved the disputed fact

by a preponderance of the evidence." *United States v. Tirado-Nieves*, 982 F.3d 1, 6 (1st Cir. 2020) (internal quotation omitted). "[W]hen there are two plausible views of the record, the sentencing court's adoption of one such view cannot be clearly erroneous." *United States v. Carrero-Hernández*, 643 F.3d 344, 351 (1st Cir. 2011) (quoting *United States v. St. Cyr*, 977 F.2d 698, 706 (1st Cir.1992)). Unpreserved claims are reviewed for plain error. *United States v. Ayala-Lugo*, 996 F.3d 51, 56–57 (1st Cir. 2021); *Rodriguez-Monserrate*, 22 F.4th at 40.

This Court treats claims that a sentencing court ignored or improperly weighed mitigating factors as procedural or substantive reasonableness ones, reviewing them for abuse of discretion if preserved and for plain error if forfeited. *Rodriguez-Monserrate*, 22 F.4th at 40; *United States v. Pantojas-Cruz*, 800 F.3d 54, 58 (1st Cir. 2015).

## Discussion

The United States will address each of Rivera's and Hernández's arguments in turn. They each fail for varying reasons.

## A. Rivera waives his criminal history category claim

Rivera argues that the district court erred by counting a sentence imposed on the same day as his sentence in this case towards his criminal history category. However, Rivera did not object to this determination, or launch any arguments to that effect at any point below. Thus, plain error review applies – but he does not argue that standard and therefore waives his claim. *See Abbas*, -- F.4th --, 2024 WL 1853052, at *18 (citing *Colón-De Jesús*, 85 F.4th at 25). Even failing to attempt to satisfy all four prongs of the plain error standard constitutes waiver on appeal. *Rodriguez-Monserrate*, 22 F.4th at 40 (citing *Pabon*, 819 F.3d at 33-34). *See also Bramley*, 847 F.3d at 5 ("The proponent of plain error must carry the devoir of persuasion as to each of the four elements that collectively comprise the plain error standard.").

If more were needed, Rivera is wrong. "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt … for conduct not part of the instant offense." U.S.S.G § 4A1.2(a)(1). Rivera's

sentence for his conviction in a separate criminal case fits in that box, even if imposed on the same day (but before being sentenced in this case).[28]

Rivera's arguments to the contrary are based on a misguided reading of the next subsection, which indicates that sentences imposed on the same day should be counted as one sentence for the purposes of apportioning criminal history points. *See* U.S.S.G § 4A1.2(a)(2). But that provision only applies to "[i]f the defendant has multiple prior sentences," U.S.S.G § 4A1.2(a)(2), and that is not the case here. There were no multiple prior sentences for which to combine points, and Rivera was sentenced as to the other conviction prior to being sentenced in this case.

Moreover, Rivera fails to provide even a single citation of his reading of the relevant provisions, even though it is contrary to their plain language. *See Rodriguez*, 659 F.3d at 175; *Zannino*, 895 F.2d at 17. *See also Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475 (1992) (judicial inquiry ends when "language s clear and unambiguous").

---

[28] Rivera foregoes arguing that the conduct underlying the other conviction was part of the instant offense, thereby waiving any such claim. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17. Nor does the record provide a basis for such an argument.

Rivera's attack on his criminal history category should therefore fail.

*B. The serious bodily injury enhancement was amply supported by the record*

Rivera waives his claim that the enhancement does not apply because he does not cite any caselaw to support his position. *Sevilla-Oyola*, 770 F.3d at 13; *Zannino*, 895 F.2d at 17; *Rodriguez*, 659 F.3d at 175. Even if he had, he nonetheless fails.

The guidelines provide for a four-level enhancement if "any victim sustained . . . Serious Bodily Injury." U.S.S.G. § 2B3.1(b)(3)(B). *See also United States v. Garay-Sierra*, 832 F.3d 64, 67 (1st Cir. 2016). As defined by the commentary to U.S.S.G. § 1B1.1, "'[s]erious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

The guidelines hold Rivera responsible for "all acts and omissions committed, aided [or] abetted … by [him.]" U.S.S.G § 1B1.3(a)(1); *see also United States v. Maldonado-Pena*, 4 F.4th 1, 60 (1st Cir. 2021). He and his cohorts employed violence that resulted in serious bodily injuries throughout the duration of the home robbery and carjacking. They punched

Luis Emilio in the face, chest, and stomach. (DE 669 at 20). They hit him on the head with a gun. (DE 669 at 20). They kept on beating him up. (DE 669 at 24). Every time the hostage-takers would walk past Antonio on the floor, they would kick him. (DE 669 at 24; DE 670 at 25). "Everybody was looking throughout the house, and since they couldn't find any money or anything, then they went ahead and started heating oil in the pan."[29] (DE 652 at 49). They poured the boiling oil on Luis Emilio's and Antonio's thighs and feet. (DE 562 at 49; DE 669 at 25-26; DE 670 at 41-3). They screamed in pain. (DE 670 at 42). The testimony at trial attributed these acts to the assailants as a group, such that the district court could conclude by a preponderance of the evidence that Rivera himself actively participated in violently assaulting Luis Emilio and Antonio – or, at the very least, that he aided and abetted these acts. *See, supra,* Issue I. *See also Tirado-Nieves,* 982 F.3d at 6; *United States v. Almeida,* 748 F.3d 41, 53 (1st Cir. 2014) (enhancements need only proof by a preponderance of the evidence). Doing so was not clear error even if there are other possible interpretations of the record. *Carrero-Hernández,* 643 F.3d at 351.

---

[29] Correa was the one who heated the oil. (DE 562 at 49).

And, contrary to Rivera's contention's, the resulting injuries were serious bodily injuries: Luis Emilio required hospital care for one or two days and both he and Antonio had to undergo treatment for over a month to attend to the burns from the hot oil. (DE 670 at 46-47); *see also* U.S.S.G. § 1B1.1 cmt. 1(M). To boot, Antonio testified as to the extreme physical pain caused by the injuries. (DE 670 at 42); *see also* U.S.S.G. § 1B1.1 cmt. n. 1(M).

Rivera is also on the hook for all the injuries caused, including those resulting from the pistol-whip to Antonio's head (which knocked him out and left him with a permanent indentation on his skull) and Guzmán's stabbing of Luis Emilio, under U.S.S.G. § 1B1.3(a)(1)(B). (DE 562 at 49; DE 669 at 26; DE 670 at 34-35, 43). That provision holds defendants accountable "in the case of jointly undertaken criminal activity" if the conduct is, like here, "within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Rijos-Rivera*, 53 F.4th 704, 709 (1st Cir. 2022). Though Rivera contends the opposite without a shred of support, (Riv. AB at 43), that is true "whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B).

Here, Rivera opted to join an armed robbery of an occupied home. The causation of serious bodily injury was foreseeable under those circumstances, especially given the nature of the offense. *See* U.S.S.G. § 1B1.3 cmt. n. (D); *United States v. Palacios*, 810 F. App'x 747, 756 (11th Cir. 2020) ("The reasoning of that application note confirms that violent or 'assaultive' conduct that occurs during a robbery is a foreseeable part of robbery."). Moreover, the assailants employed continuous and escalating violence from the outset of the incident and until its conclusion. Each vicious attack became increasingly foreseeable due to the ones that preceded it. *See Rijos-Rivera*, 53 F.4th at 709 (previous acts of violence supported foreseeability of later ones).

For all the above, the serious bodily injury enhancement was correctly applied.

### C. *The abduction enhancement was properly applied too*

The district court did not abuse its discretion when it applied the abduction enhancement under U.S.S.G. § 2B3.1(b)(4)(A). This guideline provision provides for a four-level enhancement "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.1(b)(4)(A). The Background Note to the provision states that

this enhancement applies "for robberies where a victim was forced to accompany the defendant to another location." *Id.*, comment. (backg'd.). Moreover, the application notes reference the definition of general application for "abducted" under U.S.S.G. § 1B1.1. *See* U.S.S.G. § 2B3.1, cmt. n. 1. That section defines "abducted" as when "a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, cmt. n. 1(a).

Rivera's challenge to the applicability of this enhancement is foreclosed by this Court's longstanding precedent on the matter. In *United States v. Whooten*, 279 F.3d 58 (1st Cir. 2002), the defendant forced the victim at gunpoint to exit the store being robbed and walk 65 feet into the parking lot. *Id.* at 60-61. The defendant in *Whooten* argued that the abduction enhancement should not apply because forcing the victim to walk 65 feet purportedly did not amount to a forced movement "to a different location." *Id.* This Court had "no difficulty" in finding otherwise. *Id.* In so doing, it explained that "the abduction enhancement is intended, at least in part, to protect victims against additional harm that may result from the victim's isolation, and thus applies whether the abduction is carried out by threat or

by physical force." *Id*. at 61 (citing *United States v. Cunningham*, 201 F.3d 20, 28 (1st Cir. 2000)). And because the defendant "unquestionably placed [the victim] at risk of harm, which the abduction enhancement is designed to deter," this Court in *Whooten* was "even more convinced that application of the abduction enhancement is appropriate in this case." *Id.*

The same reasoning from *Whooten* applies here. Like in *Whooten*, Luis Emilio was isolated from his family and moved from the second floor of the house to the first floor and into the carjacked car. This movement was essential to perpetrating the robbery.

Rivera points to no authority or argument that distinguishes his case from *Whooten*, or that otherwise should compel this Court to set *Whooten* aside. Indeed, in the years preceding and following *Whooten*, sister courts that have addressed the abduction enhancement have unanimously reached the same conclusion as this Court. *See, e.g., United States v. Elkins*, 16 F.3d 952 (8th Cir. 1994) (affirming abduction enhancement where defendant forced bank patron, at knife-point, out of bank and into parking lot); *United States v. Hefferon*, 314 F.3d 211, 225 (5th Cir. 2002) (explaining the Fifth Circuit had already found that "a different location" was "flexible and thus susceptible of multiple interpretations" and, as such, the abduction enhancement

applied where "the defendant's victims were forced at gunpoint to move to another location in the same parking area some fifty-to-sixty feet away") (citing *United States v. Hawkins*, 87 F.3d 722 (5th Cir. 1996)); *United States v. Taylor*, 128 F.3d 1105 (7th Cir. 1997) (affirming abduction enhancement where defendant forced bank employee at gunpoint to go from parking lot into bank); *United States v. Osborne*, 514 F.3d 377, 390-91 (4th Cir. 2008) (citing *Whooten* approvingly when applying the abduction enhancement "where defendant forced Walgreens employees at knifepoint from the pharmacy section, located in the back of the store, to the front door of the building"); *United States v. Reynos*, 680 F.3d 283 (3rd Cir. 2012) (explaining it is "not necessary to cross a property line or the threshold of a building to establish a change of location," that "the smallest of areas still may contain different locations: a judge's private office may have a location containing a desk and computer that is separate and distinct from a location containing a conference table and chairs," and that "the abduction enhancement may properly be applied even though the victim remained within the confines of a single building"); *United States v. Buck*, 847 F.3d 267, 276-77 (5th Cir. 2017) (affirming application of abduction enhancement where conspirators forced T-Mobile employees "to move from the front of the stores to the back"). A

finding that the second floor of the house, the first floor of the house, and the carjacked car were all different locations within the meaning of the abduction enhancement comports with all these cases.

Rivera's arguments for not applying the abduction enhancement in his case are unpersuasive. He fails to properly develop the argument in his opening brief, citing no authorities to support his claim. *See Sevilla-Oyola*, 770 F.3d at 13; *Zannino*, 895 F.2d at 17; *Rodriguez*, 659 F.3d at 175.

But in any event, Carmen testified at trial that, after the assailants realized there was not much to take from the house, she heard Rivera, Hernández, Ríos, and their cohorts ask: "Well what do we do now? Do we take the old lady?" (DE 669 at 27). "No. Take me," Luis Emilio said. (DE 669 at 27). "They took him" from the living room, down to the first floor. (DE 669 at 28). Antonio also testified that the gunmen took Luis Emilio to the first floor because "they wanted to take him so that they could take him out so that he could take money out from several ATMs." (DE 670 at 51). Suárez also testified, talking of his cohorts, that "[t]hey wanted to put him in one of the vehicles … from the house" (DE 652 at 50), because "they wanted to kidnap him and bring him to the closest ATM machine." (DE 652 at 54). Based on this testimony, it was not plainly or clearly erroneous to conclude

that Rivera himself took Luis Emilio to the first floor, or at the very least aided and abetted the others doing so. Again, Rivera is to be held responsible for "all acts and omissions committed, aided [or] abetted … by [him.]" U.S.S.G § 1B1.3(a)(1); *see also Maldonado-Pena*, 4 F.4th at 60.

To boot, it was reasonably foreseeable that an abduction might occur as a direct consequence of the home invasion and carjacking Rivera aided and abetted. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Patton*, 14 F. App'x 450, 454 (6th Cir. 2001) (abduction "was reasonably foreseeable given the inherently violent nature of an armed robbery offense"). An abduction within the context of the enhancement is always foreseeable in a home invasion robbery because hostage-takers can reasonably expect to need to move the occupants of a home around to control and keep watch of them.

Following that train: Rivera and his cohorts also abducted Carmen and Antonio when they took them by force and at gunpoint from the garden outside the house to the second floor living room. (DE 562 at 46-48; DE 669 at 18-20; DE 670 at 32-33). The district court could have concluded by a preponderance of the evidence that Rivera participated in that event as well, particularly because Carmen testified that he was the one that grabbed her, made her run, and forced her inside. (DE 669 at 52). Even if he had not,

needing to move hostages from outside the house to a secluded spot inside was certainly foreseeable given the nature of the home invasion.

Rivera's challenge to the abduction enhancement therefore necessarily fails.

### D. Hernández's sentencing challenge is without merit

Hernández contends his sentence was procedurally unreasonable because the sentencing court mis-weighed the sentencing factors and disregarded mitigating ones in fashioning an "upwardly variant" sentence. (Her. AB at 48-51). The problem with that argument is that he was sentenced at the bottom of the guideline range that applied to him. (DE 866 at 30-31). And he relies on caselaw pertaining to upward variances to make his claim. (Her. AB at 48-51). He therefore fails to properly develop his claim: he argues the wrong things, provides an analysis based on inapplicable caselaw, fails to identify the mitigating factors he complains the district court handled incorrectly, and fails to provide a sufficient justification to find a sentence at the bottom of the guideline range unreasonable. *See Sevilla-Oyola*, 770 F.3d at 13; *Zannino*, 895 F.2d at 17; *Rodriguez*, 659 F.3d at 175. Even if not waived, his claim still fails.

Courts must consider the 18 U.S.C. § 3553(a) sentencing factors when imposing a sentence. *United States v. Laureano-Perez*, 797 F.3d 45, 80 (1st Cir. 2015) (citing *Gall v. United States*, 552 U.S. 28, 49-50 (2007)). The § 3553(a) factors encompass any mitigating considerations that courts may weigh. *Cf. United States v. Davila-Gonzalez*, 595 F.3d 42, 49 (1st Cir. 2010) (treating mitigating factors as § 3553(a) factors).

Hernández posits that the court disregarded unidentified mitigating factors that favored a lower sentence. Any purported mitigating factors would fit squarely into the "history and characteristics of the defendant" tranche of the sentencing factors. 18 U.S.C. § 3553(a)(1).

The district court's statements evince that it fully considered the mitigating factors. At sentencing, it said that that it considered the § 3553(a) factors. (DE 866 at 30). The court also advised that it had read the presentence report and the parties' sentencing memorandums. (DE 866 at 4). It later told Hernández that his "memo [was] well written, [was] very clear," stressed that it "reviewed it" and that it "underst[ood] [his] arguments." (DE 866 at 14). When a sentencing court says that it considered certain sentencing factors, appellate courts should accord such a statement "significant weight." *United States v. Santiago Rivera*, 744 F.3d 229, 233 (1st Cir. 2014).

Even looking past what the sentencing court explicitly said, this Court should still find that the mitigating factors were taken into consideration. When outlining the rationale for its sentence, a court "is not required to address those factors, one by one, in some sort of rote incantation." *United States v. Ortiz-Perez*, 30 F.4th 107, 111 (1st Cir. 2022) (quoting *United States v. Dixon*, 449 F.3d 194, 205 (1st Cir. 2006)). "[I]t is sufficient for the sentencing court simply to identify the main factors driving its determination." *Id.* (quoting *United States v. Sepúlveda-Hernández*, 817 F.3d 30, 33 (1st Cir. 2016)).

Here, the unidentified potential mitigating factors were presumably placed squarely before the sentencing court in the presentence report and Hernández's sentencing memorandum, and then discussed at sentencing. To the extent the court did not explicitly mention them at sentencing, that only suggests that "they were unconvincing, not ignored." *Ortiz-Perez*, 30 F.4th at 112; *see also United States v. Rivera-Morales*, 961 F.3d 1, 19 (1st Cir. 2020) (explaining that "a sentencing court is under no obligation … to address every argument that a defendant advances in support of his preferred sentence"). Thus, Hernández's assertion that the court ignored the mitigating factors cannot carry the day. Hernández's challenge to the substantive reasonableness of his sentence also cannot pass muster because

courts do not err by weighing sentencing factors differently than defendants would hope or expect. A sentence is substantively reasonable "so long as it rests on a 'plausible sentencing rationale' and embodies a 'defensible result.'" *United States v. Ruiz-Huertas*, 792 F.3d 223, 228 (1st Cir. 2015) (quoting *United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008)). Sentencing courts are typically better situated to impose sentences – appellate review for substantive reasonableness is thus "highly deferential." *United States v. Madera-Ortiz*, 637 F.3d 26, 30 (1st Cir. 2011) (quoting *Martin*, 520 F.3d at 92).

Hernández also argues that the court did not afford sufficient weight to his mitigating circumstances, which he does not identify. But, as this Court has "explained time and again, a sentence is not rendered unreasonable simply because the sentencing court didn't apply as much emphasis to some mitigating factors as the defendant hoped." *United States v. Brown*, 26 F.4th 48, 71 (1st Cir. 2022); *United States v. Santa-Soler*, 985 F.3d 93, 99 (1st Cir. 2021) (explaining that "raising potentially mitigating factors does not guarantee a particular result" (cleaned up)); *United States v. Clogston*, 662 F.3d 588, 593 (1st Cir. 2011).

Moreover, the sentencing court met the benchmarks of a substantively reasonable sentence here: a plausible rationale and a defensible result. *See*

*Ruiz-Huertas*, 792 F.3d at 228. The court imposed a bottom-of-the-guidelines 151-month sentence as to the carjacking count and a statutory minimum 84-month sentence as to the firearm count which are entitled to a presumption of reasonableness. *United States v. Ortiz-Mercado*, 919 F.3d 686, 691 (1st Cir. 2019) ("a district court sentence that falls within the guideline range deserves a presumption of reasonableness"). Still, Hernández presents no argument attacking the rationale of the sentence or the defensibility of the result. *See Balser*, 70 F.4th at 617; *Zannino*, 895 F.2d at 17.

And his failure is particularly damning because "there is not a single reasonable sentence but, rather, a range of reasonable sentences." *Martin*, 520 F.3d at 92. A sentence will be reversed "if – and only if – the sentencing court's ultimate determination falls outside the expansive boundaries of that universe." *Id.* A finding that Hernández's sentence, at the very bottom of the guidelines range, does not fall within that universe is unwarranted here.

Hernández's sentencing claims must therefore fail.

## CONCLUSION

Based on the foregoing, this Court should affirm the convictions and sentences at issue.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 30th day of May, 2024.

<div style="margin-left: 50%;">

W. Stephen Muldrow
United States Attorney

Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

/s/ Ricardo A. Imbert-Fernández
Assistant United States Attorney
U.S. Attorney's Office
Torre Chardón, Suite 1201
350 Carlos Chardón Avenue
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

</div>

**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☑ this brief contains <u>19,710</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑ this brief has been prepared in a proportionally spaced typeface using <u>Book Antiqua</u> in <u>14 point</u>, *or*

    ☐ this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: 05/30/2024               /s/ Ricardo A. Imbert-Fernández
                                Signature of Filing Party

<center>**CERTIFICATE OF SERVICE**</center>

**I HEREBY CERTIFY** that on May 30, 2024, I electronically filed the

brief with the Clerk of the Court using the CM/ECF system, which will send

notification to all attorneys of record.

/s/ Ricardo A. Imbert-Fernández
Assistant United States Attorney